**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles H. STRAUGHTER, Genell Brown, LaDonna Thornton, Defendants–Appellants.**

**Nos. 91–3002, 91–3012 and 91–3149.**

United States Court of Appeals, Sixth Circuit.

Submitted Sept. 23, 1991.

Decided Nov. 14, 1991.

Gary L. Spartis, Office of the U.S. Atty., Columbus, Ohio, and William E. Hunt, Office of the U.S. Atty., Cincinnati, Ohio, for the United States.

James H. Banks, Columbus, Ohio (briefed), for Charles H. Straughter.

John F. Jackson, Columbus, Ohio (briefed), for Genell Brown.

Steven Mathless, Cassidy & Meeks, Columbus, Ohio (briefed and argued), for LaDonna Thornton.

Before MARTIN and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Appellants Genell Brown ("Brown"), LaDonna Thornton ("Thornton"), and Charles Straughter ("Straughter") were indicted by a federal grand jury for offenses related to a conspiracy to distribute cocaine. The jury trial resulted in conviction of the three defendants. They now appeal their judgments of conviction, seeking reversals. Alternatively, Straughter urges this court to issue an order mandating a change in his

sentence. For the following reasons, we affirm all convictions and sentences.

## I.

Straughter, Thornton, and Brown make a wide variety of assertions of error on this appeal. For that reason, it is necessary to relate the facts of this case in some detail.

On March 29, 1990, after three days of surveillance of Straughter and his associates, Columbus, Ohio, police observed Straughter delivering a white plastic bag containing two kilograms of cocaine to Michael Richardson, a co-conspirator. The police arrested Straughter, Brown, Thornton, and others, and they searched Michael Richardson's car, Straughter's residence at 7074 White Butterfly (the "White Butterfly" residence), Brown's apartment at 5766 Karenway (the "Karenway" apartment), and an apartment at 5563 Mesa Ridge Road (the "Mesa Ridge" apartment).

Police surveillance of the defendants began two days before the arrests. At 1:00 p.m. on March 27, 1990, police observed a black woman driving a red Escort meet Straughter, who was parked in front of a cleaners. Straughter passed the woman something through the window, and when he withdrew his hand, he held a wad of cash. Thornton rented a red Escort from March 16 to March 28, 1990. Later on March 27, a policeman stopped the red Escort for littering, identified Thornton as the driver, and observed a large wad of cash in her purse.

Later that evening, around 7:30 p.m., police saw Straughter meet someone in the parking lot of a Denny's restaurant. Brown then arrived, met with Straughter, and left when Straughter and the man entered Denny's. Brown promptly returned, placed a package in Straughter's Bronco, and departed. Straughter and the man exited Denny's restaurant. Straughter delivered the package to the man, and the two men departed.

On March 29, 1990, two days later, surveillance of Straughter's White Butterfly residence commenced around 8:50 a.m. A woman arrived in a black Escort leased to Thornton. Shortly thereafter, another woman and two men arrived. The men were later identified as Michael Richardson and Rozelle Carruthers. Richardson and the woman went inside while Carruthers remained in the car. Richardson exited the White Butterfly residence, took Carruthers back to their motel, and then returned to the White Butterfly residence.

The black Escort rented by Thornton left the White Butterfly residence later that morning, arriving at the Mesa Ridge apartment at noon. Straughter was then observed making several trips in and out of the Mesa Ridge apartment complex. This apartment had been rented the previous day by a woman using the name Karen Reynolds. Two persons, representing themselves as George and Karen Reynolds, met with the rental agent to lease the apartment "for relatives." Brown cosigned the lease. The rental agent identified Straughter as the man who purported to be George Reynolds.

At about 1:00 p.m., Straughter left the Mesa Ridge apartment in the black Escort rented by Thornton. Police followed the Escort to Carnaby Shopping Mall. At about the same time, Thornton, driving Straughter's Bronco, and another car containing driver Michael Richardson and a woman, left the White Butterfly residence. Thornton led Richardson to the corner of McNaughten and Main. She parked at the Carnaby Shopping Mall, next to the black Escort. Thornton directed Richardson to park in a lot across the street.

Thornton removed from the Escort a medium-sized white plastic bag and a "large cloth bag." She gave them to Straughter, who placed them in the Bronco. Straughter got into the Bronco, drove across the street, and handed Michael Richardson a white plastic bag that matched the description of the smaller of the bags that Thornton had just transferred from the Escort to the Bronco.

Michael Richardson returned to his car, and both vehicles departed. Police followed Michael Richardson to his motel, where he and Veronica Williams picked up Rozelle Carruthers and Beverly Woods.

Police then arrested all four individuals. Inside Veronica Williams' purse, police found two kilograms of cocaine in a white plastic bag.

Simultaneously, the police followed Straughter to the Karenway apartment. He arrived at about 1:30 p.m., removed a "large, red gym bag" from the Bronco, and took it into the apartment. He left five minutes later, without the bag. After Straughter departed, police maintained surveillance of the Karenway address, which had not been under surveillance prior to Straughter's arrival.

The police next observed Straughter around 2:00 p.m., as he departed the White Butterfly address in his Bronco. He subsequently was stopped and arrested. After Straughter's arrest, the police decided to obtain search warrants for Straughter's White Butterfly residence, the Karenway apartment, and the Mesa Ridge apartment. These addresses were kept under surveillance after Straughter's arrest. Preparation of the warrants began around 4:00 p.m. that day.

Before the search warrants were obtained, events occurred that caused the police to enter the White Butterfly and Karenway addresses. At the White Butterfly residence, the police stopped a car after it left the residence around 3:30 p.m., and the occupant informed the police that other people were in the residence. Police SWAT officers entered the residence to secure it until a search warrant could be obtained. The SWAT officers searched the residence for people. Afterward, two narcotics officers remained in the White Butterfly residence to secure it until the search warrant was obtained.

Police did not know whether anyone was in the Karenway apartment. Around 4:20 p.m., after approximately three hours of surveillance, officers saw a Cadillac stop in front of the apartment. Two people emerged, walked toward the apartment, and stopped about six feet from the door. They looked at the officers in the surveillance vehicle, split up, and walked away from the building, disappearing behind a fence.

Apparently worried about the destruction of evidence, the officers then entered the Karenway apartment without the search warrant. They believed that Straughter had many associates, employed counter-surveillance, used mobile phones for easy communication, and had associates who could communicate with anyone in the apartment.

SWAT officers entered the Karenway apartment at 5:15 p.m. They found no people, but one officer found in a closet a "large, partially open bag," containing what he believed to be kilograms of cocaine. (This appears to be the bag that Thornton transferred from the Escort to the Bronco earlier that day). He replaced the bag and reported the incident. Two policemen remained in the Karenway apartment to secure it until the search warrant arrived.

After the search warrants arrived, officers searched the three locations. When officers searched the Mesa Ridge apartment, they found money wrappers, brown wrapping paper, tape, and $231,332 in cash. At the White Butterfly residence, police found memoranda, mink coats, and firearms. At the Karenway apartment, they found twenty-three kilograms of cocaine in the "red gym bag" that Straughter carried into the apartment earlier that day. Police also found a triple beam scale, an electronic scale, ziplock bags, empty kilogram wrappers, rubber gloves, adulterants, and a knife with white powder residue.

After the SWAT team entered the Karenway apartment, but before the execution of the search warrant, police were notified that Brown was en route to the Karenway apartment. Members of the news media already had arrived at the apartment. Police observed Brown stop as she approached the apartment, back up, and pull into a dead end street. She then used her cellular telephone. The police approached Brown and asked her to return with them to her apartment, where the police planned to execute a search warrant. Brown agreed.

Police formally arrested Brown after the execution of the search warrant. Inside

Brown's purse, police found receipts for rental cars in Brown's and Straughter's names, mail addressed to Straughter, $1000 money wrappers, and two ledgers that were subsequently identified as drug records in Brown's handwriting. An expert identified the latter as records of a cocaine distribution business, itemizing sales, purchase prices, and debts collected.

Following the arrests, Veronica Williams and Michael Richardson agreed to testify and to plead guilty to conspiracy to possess with intent to distribute two kilograms of cocaine. Michael Richardson testified that he had been dealing with Straughter since May of 1989, and that he had handled thirty to forty kilograms of cocaine from Straughter prior to the March 29, 1990, arrests. The testimony of Veronica Williams and Michael Richardson corroborated the police version of the events of March 29 that involved Michael Richardson. Richardson testified that he paid $52,000 to Straughter for the two kilograms of cocaine that police later found in Veronica Williams' purse.

Pursuant to a multi-count indictment, Straughter, Thornton, and Brown were convicted of several offenses related to a conspiracy to distribute cocaine. Specifically, all three defendants were convicted of conspiracy to distribute and to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846 (West Supp.1991). Straughter and Thornton were convicted of distribution of approximately two kilograms of cocaine to Michael Richardson, in violation of 21 U.S.C. § 841 (1981) and 18 U.S.C. § 2 (1969). All three defendants were convicted of possession with intent to distribute approximately twenty-three kilograms of cocaine, which were found in the Karenway apartment, in violation of 21 U.S.C. § 841 (1981) and 18 U.S.C. § 2 (1969). Finally, Straughter and Brown were convicted of maintaining a location to store narcotics (the Karenway apartment), in violation of 21 U.S.C. § 856 (West Supp.1991) and 18 U.S.C. § 2 (1969).

Straughter was sentenced to three concurrent terms of 360 months, one concurrent term of forty-one months, and five years of supervised release. Thornton was sentenced to three concurrent terms of 121 months, and five years of supervised release. Brown was sentenced to two concurrent terms of 180 months, and one concurrent term of twenty-seven months.

## II.

The defendants first contend that the warrantless entries into the White Butterfly residence and the Karenway apartment constituted unreasonable searches and seizures, which required exclusion of the evidence obtained therein.

### A. The White Butterfly Residence

Only Straughter claims that the warrantless entry into and the securing of the White Butterfly residence violated the Fourth Amendment. He asserts that the SWAT officers should have secured the residence from without, not from within. He next claims that the warrant was signed at 7:30 p.m. and supposedly executed at 7:35 p.m., but that the "evidence return" that was made after the search and seizure indicates that the actual search of the secured premises was executed at 4:30 p.m. He concludes that the police violated his right to be free of unreasonable searches and seizures, that the district court erroneously admitted illegally obtained evidence, and that this was not harmless error.

In response, the government argues that there were exigent circumstances that justified the warrantless entry to secure the White Butterfly residence. The government notes that the police had information indicating that there were people in the White Butterfly residence after Straughter's arrest. The government points out that Straughter had many associates, they used cellular telephones to communicate, and cocaine is notoriously easy to destroy. The government claims that the SWAT officers did not conduct an evidence search of the residence, but merely searched the premises for people, secured it, and awaited the arrival of the warrant.

## B. The Karenway Apartment

All three defendants claim that the warrantless entry into the Karenway apartment violated the Fourth Amendment.[1] Brown contends first that the SWAT entry was illegal because there were no exigent circumstances that would allow entry before the warrant was issued. She next asserts that the police had no reason to believe that the "red gym bag" contained cocaine. This leads her to conclude that there was no reasonable basis to secure the residence; she also contends that there was no probable cause to support the search warrant that was eventually issued and that the police obtained the warrant in bad faith. Finally, Brown asserts that because the officer who applied for the warrant already had heard that the SWAT police found the red gym bag of cocaine, he can claim no independent source for the warrant. Thus, Brown reasons, if the SWAT entry were tainted, so were the entry and search pursuant to the warrant that was later issued.

Straughter asserts that the warrantless entry by the SWAT police was unnecessary; they should have secured the apartment from outside. He claims that the police had no reason to believe there was anyone inside the apartment when the SWAT police entered. Even if the SWAT entry were justifiable, Straughter claims that they could search only for people and that their inspection of the contents of the red gym bag went beyond the proper scope of the search.

Thornton claims that a warrantless search may not be justified by the possibility of the destruction of evidence. Moreover, she asserts that the government failed to show a reasonable belief that there were persons in the Karenway apartment or that the destruction of evidence was imminent. She notes that police watched the apartment from 1:30 p.m. until SWAT police entered, and they observed no activity inside the apartment. Finally, she notes that the policeman that applied for the warrant admitted that he was unsure whether he told the issuing judge that the SWAT officers already had found cocaine in the apartment. Thornton concludes, therefore, that the government relied upon tainted information to procure the search warrant.

The government claims that exigent circumstances justified the warrantless entry of the Karenway apartment. It notes how easily cocaine is destroyed. It claims that, after Straughter delivered the red gym bag to the apartment, it was reasonable for the police to assume that he would not leave the drugs unguarded. Additionally, the police found further reason to believe that the apartment was occupied when two people arrived in a Cadillac, approached the door, looked at the surveillance police, then disappeared on foot. The police inferred from this that the two people expected someone to be in the apartment, and that they may have received a signal from within the apartment.

The government next points out that the apartment was not searched for narcotics until the warrant was issued. The police knew about the partially open, red gym bag of cocaine in the closet only because the SWAT officers checked the closet for people while securing the house. When an officer moved some clothes, the cocaine apparently was in plain view in the half-open gym bag. Finally, the government claims that, even if the SWAT entry violated the Fourth Amendment, the search warrant issued later that evening was based upon independent probable cause and supports the admission into evidence at trial of the twenty-three kilograms of cocaine found in the gym bag.

## C. The Exigent Circumstances Exception to the Fourth Amendment's Warrant Requirement

 Although warrantless entries into a person's home are presumed to be unrea-

---

1. Because only Brown appears to have resided at the Karenway apartment, it is not clear that Straughter and Thornton have the necessary standing to assert a Fourth Amendment right to privacy in that apartment. The government, however, does not raise this issue, and we decline to make any determination regarding the Fourth Amendment standing of any of the defendants.

sonable under the Fourth Amendment, *see Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court consistently has held that certain exigent circumstances may justify a warrantless entry. *See Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2801–02, 37 L.Ed.2d 757 (1973). A warrantless entry to preserve evidence may be permissible when it is based upon probable cause and supported by exigent circumstances. *See United States v. Delguyd*, 542 F.2d 346, 351 (6th Cir.1976).

Recently, we adopted a two-pronged test to determine when the possibility of the destruction of evidence might justify a warrantless entry into a home. *See United States v. Sangineto–Miranda*, 859 F.2d 1501 (6th Cir.1988). Judge Boggs, writing for the court, stated that a warrantless entry to prevent the destruction of evidence "is justified if the government demonstrates: (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent." *Id.* at 1512.

The standard of review for a finding of exigency is a mixed one: "We will review de novo the district court's legal rulings with respect to the issue of exigency.... A district court's factual findings on the issue of exigent circumstances will be disturbed only if they are clearly erroneous." *United States v. Radka*, 904 F.2d 357, 361 (6th Cir.1990). Thus, the district court's findings of fact in support of the exigent circumstances determination shall be overruled only if they are clearly erroneous. The district court's conclusion that a given set of facts constitutes exigent circumstances, however, shall be reviewed de novo, as is any other conclusion of law.

The district court made several factual findings in support of the warrantless entry at the White Butterfly residence. At the time of the SWAT officers' entry, the police had not arrested all of the persons involved in the conspiracy, nor were they all under surveillance. The police knew that there were people in the house. They also knew that Straughter's associates communicated by cellular phone and that

Straughter and some members of the conspiracy had been arrested. The police believed that Straughter had acquired a large amount of cocaine. The police were concerned that the people in the White Butterfly residence would become aware of the earlier arrests and destroy any evidence.

First, none of these factual findings appear to be so lacking in support on the record that they could be characterized as clearly erroneous. Second, the district court's conclusion that these facts support a determination of exigent circumstances is correct. The police had a reasonable belief that there were people in the White Butterfly residence because they stopped a departing person, who told them that there were others within the residence. The belief that the evidence sought was in imminent danger of destruction was reasonable under the circumstances. The police could not prevent the destruction of evidence without entering the residence and moving out the occupants.

The district court made several factual findings in support of the warrantless, exigent circumstances entry of the Karenway apartment. The police had reason to believe that there was a large quantity of cocaine in the red gym bag that Straughter left at the apartment. They believed that it would be guarded. They observed a man and woman walk toward the residence, and then depart after they saw the officers. The police inferred that the couple was expecting someone to be home. The surveillance officers were unable to watch all sides of the apartment. Finally, the police interrupted their surveillance to follow the couple for a short time.

These factual findings are adequately supported in the record; they are not clearly erroneous. The district court's legal conclusion that these facts constitute such exigent circumstances as support a warrantless entry, however, is a different matter. The facts found by the district court do not support a determination that the police had a reasonable belief that third parties were inside the dwelling, the required first prong of the *Sangineto–Mi-*

*randa* test. *See Sangineto–Miranda,* 859 F.2d at 1512.

The government's theories would deprive the first prong of the *Sangineto–Miranda* test of all independent vitality. The inability of the police to watch all of the doors of the apartment all of the time cannot support a reasonable belief that third parties were inside. The rapid departure of the couple that saw the surveillance officers is unconvincing. The government's theory of a signal from within is pure speculation; although this theory might support a subjective belief that persons were within, it does not support an objectively reasonable one. The *Sangineto–Miranda* standard is an objective one, not a subjective one. *U.S. v. Radka,* 904 F.2d 357, 362–63 (6th Cir. 1990).

Finally, the officers' reasonable belief that there was a large quantity of cocaine in the apartment, coupled with their speculation that it would not be left unguarded, fails to support a reasonable belief that there were third persons in the apartment. The government is attempting to bootstrap its reasonable belief that there was evidence in the apartment into a reasonable belief that there were third parties in the apartment. A determination that the warrantless entry to secure the Karenway apartment was acceptable under this theory would be tantamount to a holding that the warrant requirement for an entry to secure premises is inapplicable whenever the police have a reasonable belief that there are illegal drugs present. The entry by the SWAT officers fails to satisfy the first prong of the *Sangineto–Miranda* test. We find that the SWAT entry of the Karenway apartment constituted a violation of the Fourth Amendment.

■ The Supreme Court has held, however, that the Fourth Amendment does not require the suppression of evidence initially discovered during an illegal entry if that evidence is seized during a later search pursuant to a warrant that is not based on evidence obtained during the illegal entry. *See Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The district court concluded that "the judge issued the search warrants in this case without knowledge of and free of any taint from information obtained during the initial entry into the residences." As to the White Butterfly residence, there is no reason to question this conclusion. As to the Karenway apartment, however, there is reason to question the conclusion. Although the warrant affidavit contained no information regarding the SWAT team's discovery of the red gym bag of cocaine, the affiant officer did testify that he was not sure whether he told the judge when he presented the affidavit that cocaine had been found. This candid testimony, however, does not so undercut the district court's factual finding as to make it clearly erroneous.

■ We conclude that none of the police actions taken at the White Butterfly residence violated the Fourth Amendment. Although the securing of the Karenway apartment violated the Fourth Amendment, the police later seized the evidence therein pursuant to a valid warrant based on independent information. Because the warrant was obtained on the basis of wholly independent information, suppression of the evidence obtained at the Karenway apartment was not required. After a thorough review of the record, we conclude that the remainder of the defendants' contentions regarding the searches lack merit.

### III.

■ Defendants Straughter and Brown next complain that the district court erroneously refused to require the disclosure of the identity of the government's confidential informant and limited the scope of cross-examination concerning the confidential informant. Brown and Straughter contend that they wished to show entrapment and governmental misconduct, but the district court prevented them from doing so by barring cross-examination regarding the confidential informant.

In response, the government claims that the district court properly shielded the disclosure of the identity of the confidential informant and limited certain cross-exami-

nation. The district court found that the government "produced compelling evidence that the life of the informant would be significantly endangered if the informant's identity is revealed."

When the public interest in protecting the flow of information to the government outweighs the defendant's need for disclosure of information in the preparation of a defense, the courts have long recognized a governmental privilege to shield disclosure of such information. *See Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The district court, which viewed the evidence *in camera*, undertook the balancing required by *Roviaro*. For this reason, we review the district court's denial of discovery only to determine whether there was an abuse of discretion that resulted in substantial prejudice. *See United States v. Lanci*, 669 F.2d 391, 393 (6th Cir.), *cert. denied*, 457 U.S. 1134, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982).

In reviewing the materials pertaining to the confidential informant *in camera*, the district court determined that they were in no way exculpatory to the defendants. *In camera* review of such material provides the proper method of conducting the necessary balancing without unnecessarily disclosing the confidential informant's identity. *See United States v. McManus*, 560 F.2d 747, 751 (6th Cir.), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1977). Once the government meets the burden of showing that an informer's testimony would not be helpful to the defense, then the *Roviaro* test balances in favor of nondisclosure. *Id.* Moreover, danger to the informant's life must be given significant weight in striking the *Roviaro* balance. *See Lanci*, 669 F.2d at 393.

The district court undertook the proper balancing of interests and noted the danger to the life of the confidential informant. After a thorough review of the confidential record, we conclude that the district court did not abuse its discretion by shielding the identity of the informant.

## IV.

█ Thornton and Brown next contend that the evidence at trial fails to support the judgments against them.

[A judgment will be reversed for] insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and ... this rule applies whether the evidence is direct or wholly circumstantial. It is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt.

*United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984). It is apparent from the facts related in this opinion that there was more than sufficient evidence to convict both of these defendants. We conclude that there was sufficient evidence to support the judgments against Brown and Thornton.

## V.

█ Straughter contends that the trial judge openly displayed animosity toward the defendants and that this deprived him of his right to due process of law and a fair trial. He claims that the judge sustained the government's objections by addressing the jury, but he only grudgingly sustained defense objections. Straughter claims that the judge should not have stood when the cocaine was shown to the jury. Finally, he claims that his counsel should not have been openly admonished before the jury.

The government responds that the record, taken as a whole (seven volumes containing over 800 pages), does not support Straughter's allegations of bias. It also notes that Straughter's claim that the judge stood when the cocaine was presented to the jury is unsupported by the record.

"The basic requirement [of the role of a federal trial judge] is one of impartiality in demeanor as well as in actions." *U.S. v. Hickman*, 592 F.2d 931, 933 (6th Cir.1979). Straughter's vague allegations of bias and misconduct fail to mandate a new trial here. The actions and statements of the trial judge, taken as a whole, do not approach the sort of conduct that mandates a new trial.

█ Straughter also protests the qualification of Detective Stevens as an expert

on the pricing of cocaine. The qualification of Detective Stevens as an expert finds adequate support in the record, which contains extensive testimony regarding his qualifications, and support in the case law. *See Heuss v. Rockwell Standard Corp.,* 495 F.2d 1207, 1210 (6th Cir.1974) (determination of the qualifications of an expert witness must be sustained unless manifestly erroneous).

We conclude that the trial judge did not demonstrate such bias as requires a new trial and that he did not abuse his discretion by qualifying Stevens as an expert.

## VI.

Thornton alleges that her Sixth–Amendment right to effective assistance of counsel was violated. First, she notes that her trial lawyer was the wife of Straughter's lawyer and that her trial lawyer practiced law in conjunction with him.[2] Thornton claims that this conflict deprived her of the effective assistance of counsel. Second, Thornton alleges several specific defects in her lawyer's performance at trial as supporting her ineffective assistance allegation: she alleges that her counsel offered no opening statement; she failed to cross-examine key government witnesses; she failed to join in many objections; she failed to present witnesses in Thornton's behalf; and she failed to have Thornton testify in her own behalf.

### A. The Conflict Claim

■ The government responds to the conflict argument by pointing out Thornton's waiver of any conflict. The record indicates that the district court made Thornton aware of the potential conflict between her and Straughter's interests and offered free, court-appointed counsel for her on three separate occasions. The government asserts that Thornton chose to waive her right to conflict-free counsel and instead to exercise her right to counsel of choice.

Because the district court discussed this issue three times with Thornton, it is clear that it was fully aware of this conflict. "[W]hen a trial court becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not." *United States v. Krebs,* 788 F.2d 1166, 1172 (6th Cir.1986) (citation omitted). Each time the district court raised the conflict issue, Thornton waived her right to conflict-free counsel. During the hearing on the government's motion to clarify the conflict, the court discussed the issue for the second time, saying:

Now, it is the Court's recollection that at the arraignment of this case, the Court did inquire of these defendants [Straughter and Thornton] regarding their understanding of possible dangers with respect to a conflict of interest and that the Court advised them that they each had the right to be represented by separate counsel, and that if either of them could not afford to retain separate counsel, that the Court would appoint counsel for them. The Court reiterates those statements at this time.

The district court then proceeded to explain to Thornton some of the specific risks arising from her representation by Straughter's lawyer: that Straughter's lawyer would be unwilling to trade Thornton's testimony against Straughter for a favorable plea-bargain agreement; that counsel might not take actions that were in Thornton's best interest because they were detrimental to Straughter; and that, should Thornton decide that she wished to testify, Straughter's lawyer would attempt to prevent her from doing so because the government would elicit on cross-examination testimony detrimental to Straughter. After Thornton affirmatively indicated her understanding of each of these dangers, the district court reiterated her right to free, court-appointed counsel if she were unable to afford separate counsel. After all of this, Thornton unambiguously indicated her desire to proceed without separate counsel.

2. Initially, Straughter and Thornton were represented by the same lawyer. On the first morning of trial, a separate lawyer, who was the wife and law associate of Straughter's lawyer, appeared on behalf of Thornton.

The district court again discussed the conflict on the first morning of the trial, when Ms. Najjar, the wife and law associate of Straughter's lawyer, filed a notice of appearance as counsel for Thornton. The court clearly explained to Thornton that, because Ms. Najjar and Straughter's lawyer practiced law together, the same conflict problems existed to the same degree. Thornton indicated that she understood. The court again offered free, court-appointed counsel; Thornton indicated her desire to continue to be represented by Ms. Najjar.

A defendant may make a knowing, intelligent, and voluntary waiver of her right to conflict-free counsel, and a defendant has a Sixth–Amendment right to counsel of her choice. *See Krebs,* 788 F.2d at 1173.

> [W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

*Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981).

It is clear that the district court took great pains to inform Thornton of the import of her waiver. We conclude that Thornton made a voluntary, knowing, and intelligent waiver of her Sixth Amendment right to conflict-free counsel, and she may not now invoke the constitutional right that she chose to waive.

### B. The Incompetence Claim

■ Thornton also alleges that her lawyer's performance during the trial was so defective that she was deprived of her right to the effective assistance of counsel, citing several alleged defects in her law-

yer's performance. We find it unnecessary to reach the merits of this issue because it is not properly presented to this court.

Thornton has never raised in the district court, in any form, the issue of the incompetent performance of counsel. This court generally will not review an ineffective assistance of counsel claim that is raised for the first time on appeal.[3] *See United States v. Martin,* 920 F.2d 345, 349 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991); *United States v. Swidan,* 888 F.2d 1076, 1081 (6th Cir.1989). When the record is adequate to assess the merits of an ineffective assistance of counsel claim, however, the claim may be considered, even if it were never presented to the district court. *See United States v. Wunder,* 919 F.2d 34, 37 (6th Cir.1990).

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court enumerated the elements of an ineffective assistance of counsel claim premised on the incompetence of counsel due to specific errors or omissions during the course of representation. A defendant must affirmatively prove (1) unreasonable acts by counsel that "were outside the wide range of professionally competent assistance," and (2) prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 690, 694, 104 S.Ct. at 2066, 2068.

■ The proper resolution of these issues in this case involves allegations and evidence that are outside the record. The district court is best situated to make the necessary factual findings and conclusions in the first instance. These determinations may require testimony from Thornton's lawyer regarding the trial strategy she pursued. We find that the better course requires that the effectiveness of counsel

---

**3.** Several circuits follow this approach. *See United States v. McDonald,* 935 F.2d 1212, 1220 (11th Cir.1991); *United States v. DeFusco,* 930 F.2d 413, 415 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 239, 116 L.Ed.2d 194 (1991); *United States v. Gonzales,* 929 F.2d 213, 215 (6th Cir.1991); *United States v. Young,* 927 F.2d 1060, 1061 (8th Cir.1991), *cert. denied,* —— U.S.

——, 112 S.Ct. 384, 116 L.Ed.2d 334; *United States v. Sanchez,* 917 F.2d 607, 612–13 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1990); *United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990); *United States v. Gambino,* 788 F.2d 938, 950 (3rd Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986).

issue be first raised before the district court, so that a sufficient factual record may be developed and the views of the trial judge may be expressed.

We conclude that the appellate record is inadequate to assess the merits of Thornton's claim. Thornton may properly pursue this claim in a collateral, post-conviction proceeding under 28 U.S.C. § 2255 (1971).

## VII.

■ At trial, Thornton's counsel asked a car-rental agent the following question: "Were you aware that [Thornton] rented the car at one point to take her sick grandmother to visit relatives out of state?" Thornton's motive for frequently renting cars was relevant because the government contended that she rented the cars to aid in the distribution of the cocaine. The district court sustained the government's objection. Thornton claims that the testimony should have been admitted under Fed.R.Evid. 803(3), the state-of-mind exception to the hearsay rule. The government, in response, notes several deficiencies in the form of the question: it failed to ask the rental agent if *Thornton* told him of any reason for renting the car; and it refers neither to a specific time nor car.

We need not decide whether, as Thornton contends, this statement is admissible under the state-of-mind exception to the rule against hearsay evidence. The rental agent might have responded based upon hearsay from another source, which might not qualify for the Rule 803(3) exception or the agent, in response to the question asked, might have referred to a different occasion or a different car. Further, Thornton's counsel failed to alter the form of her question or to elicit a specific ground for the exclusion of the evidence. We find that the district court's sustaining of the objection did not constitute error.

## VIII.

■ Straughter's final claim is that the district court incorrectly applied the Federal Sentencing Guidelines. He first claims that his initial offense level should have been thirty-four, not thirty-six. The dispute turns on the amount of cocaine that can be attributed to Straughter. The police seized twenty-five kilograms during the March 29 arrests. An offense level of thirty-four applies for fifteen to fifty kilograms of cocaine, and an offense level of thirty-six applies for fifty to one hundred fifty kilograms of cocaine. *See* U.S.S.G. §§ 2D1.1(a)(3) and (c)(4) and (c)(5).

Although the police confiscated only twenty-five kilograms of cocaine on the day of the arrests, co-conspirator Michael Richardson testified that he had purchased thirty to forty kilograms of cocaine from Straughter during the previous year. The government claims that this testimony justifies the initial offense level of thirty-six. Straughter claims that it is improper to punish him for the additional kilograms based solely on the testimony of a co-conspirator, particularly one who has traded testimony to the government in exchange for a plea agreement.

"A district court's decision on the amount of cocaine a defendant is to be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." *United States v. Walton*, 908 F.2d 1289, 1300–01 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). The Sentencing Guidelines contemplate the situation where the police do not seize all of the cocaine that a defendant is convicted of possessing:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, ... similar transactions in controlled substances by the defendant.

*Id.* at 1301 (citing Former Application Notes 1 and 2 to U.S.S.G. § 2D1.4, *reprinted in* United States Sentencing Commission Guidelines Manual (Oct. 15, 1988)). Additionally, Richardson's testimony was corroborated by the records found in Brown's purse, which noted collection of payments

of $330,000. We find that the district court's conclusion was not clearly erroneous.

Straughter next contends that he should not have received a two-offense-level firearms enhancement of his sentence. Handguns were found in the bedroom of Straughter's White Butterfly residence. Straughter offers no substantial reason for his contention that the district court's determination that these were used in furtherance of the conspiracy should be overturned as clearly erroneous. We previously have rejected the argument Straughter now makes. *See United States v. Snyder*, 913 F.2d 300, 303–04 (6th Cir.) (rejecting defendant's claim that it was error to apply a firearms enhancement to his cocaine conviction for handguns that were found in his bedroom nightstand), *cert. denied*, —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1990). Similarly, we reject Straughter's argument here.

Straughter's last argument about his sentence states that the 360–month sentence he received amounts to a life sentence and that the Cruel and Unusual Punishment Clause of the Eighth Amendment bars such a sentence under the facts of this case. This argument is patently meritless. *See, e.g., Young v. Miller*, 883 F.2d 1276, 1282–86 (6th Cir.1989) (first-time offender convicted of one-time possession with intent to deliver 1,300 grams of heroin sentenced to life in prison without parole), *cert. denied*, —— U.S. ——, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991).

We conclude, therefore, that the convictions and sentences herein should be, and are hereby, AFFIRMED.