**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Francis J. JONES, Jr.,
Defendant-Appellant.**

**No. 85–2662.**

United States Court of Appeals,
Tenth Circuit.

Jan. 9, 1987.

---

Michael Lerner, Overland Park, Kan., for defendant-appellant.

Robert S. Streepy, Asst. U.S. Atty. (Benjamin L. Burgess, Jr., U.S. Atty., with him on the brief), Kansas City, Kan., for plaintiff-appellee.

Before BARRETT and SEYMOUR, Circuit Judges, and CHILSON, District Judge.*

SEYMOUR, Circuit Judge.

Dr. Francis J. Jones, Jr., was convicted in a jury trial of conspiracy to distribute Schedule III and Schedule IV controlled substances in violation of 21 U.S.C. § 846 (1982). On appeal, Dr. Jones contends that the trial court erred in refusing to grant his motion for a judgment of acquittal. After carefully reviewing all of the evidence, we agree that it is insufficient to support Dr. Jones' conviction. Consequently, we reverse.

Defendant was jointly tried with two codefendants, John Paul Jones and Ethel Clagget. John Paul Jones, defendant's cousin, was found guilty of one count of conspiring to distribute controlled substances, seven counts of distributing controlled substances, and two counts of attempting to evade income taxes. He has separately appealed in our No. 85–2605. Ethel Clagget was found not guilty of conspiracy to distribute controlled substances.

Francis J. Jones is a doctor of osteopathy who owned the Central Clinic in Kansas City, Kansas. In the summer of 1979, Dr. Jones leased the clinic to Dr. Vernon Webb. Dr. Webb hired, as a physician's assistant, John Paul Jones, who had previously worked for Dr. Jones at the Central Clinic. John Paul Jones was charged in this case with illegally distributing controlled substances from 1979 to 1981 by masquerad-

---

* Honorable Hatfield Chilson, Senior Judge, District of Colorado, sitting by designation.

ing as a physician and by issuing fraudulent prescriptions.

The Government contended at trial that Dr. Jones was a conspirator in his cousin's scheme to distribute drugs. In the summer of 1979, following a prior conviction for illegally distributing controlled substances, Dr. Jones' Drug Enforcement Administration (DEA) registration was revoked. Without a DEA registration number, Dr. Jones was unable to prescribe controlled substances, although he continued to be licensed to practice medicine. He then leased his clinic to Dr. Webb. According to the Government, Dr. Webb agreed with Dr. Jones to hire John Paul Jones as part of the lease agreement. The essence of the Government's theory was that Dr. Jones leased the clinic to Dr. Webb, who had a valid DEA registration number, and required Dr. Webb to hire John Paul Jones so that John Paul could illegally distribute controlled substances, using Dr. Webb's registration number. The Government contended that Dr. Jones helped John Paul to masquerade as a physician at the clinic by telling several patients that John Paul would be taking care of them after Dr. Jones left the clinic.

In reviewing a denial of a motion for a judgment of acquittal, this court must consider, in a light most favorable to the Government, all of the direct and circumstantial evidence and the inferences that may reasonably be drawn from that evidence. *United States v. Hooks*, 780 F.2d 1526, 1529 (10th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986); *United States v. Parrott*, 434 F.2d 294, 297 (10th Cir.1970), *cert. denied,* 401 U.S. 979, 91 S.Ct. 1211, 28 L.Ed.2d 330 (1971). The court must then determine whether "a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Hooks*, 780 F.2d at 1531. The Government's evidence need not disprove every reasonable hypothesis of innocence. *See id.* at 1530. Nevertheless, the evidence supporting the conviction must be "substantial; that is, it must do more than raise a mere suspicion of guilt." *United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir.), *cert. denied,* 404

U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

"The essence of the crime of conspiracy is an agreement to commit an unlawful act." *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982). "Although the agreement may be inferred from the facts and circumstances of the case, and 'need not take any particular form, there must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy.'" *Id.* (quoting *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir. 1974)). "To be guilty of conspiracy, a defendant must possess '*at least* the degree of criminal intent necessary for the substantive offense itself.'" *Id.* (quoting *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959)). "The defendant lacks the requisite criminal intent if he does not know the conspiracy's objective"; this knowledge must be shown by "clear, unequivocal evidence." *Id.* "A defendant's mere association with conspirators is not enough to support a conspiracy conviction." *United States v. Austin*, 786 F.2d 986, 988 (10th Cir.1986).

With those principles in mind, we review the evidence. As a central part of its case, the Government claimed that Dr. Jones' lease with Dr. Webb included an unwritten agreement that Dr. Webb would employ John Paul Jones at the Central Clinic. The Government's only witness on this point was Dr. Webb. He testified that he approached Dr. Jones regarding the possibility of leasing the clinic when he heard that it was available. Knowing that he would need help in the clinic, he first tried to hire Linda Teague, and then Joy Murray, both assistants of Dr. Jones. At that time, he had not heard of John Paul. One of the women initially agreed to work for Dr. Webb, but then decided not to stay. Thereafter, Dr. Webb asked Dr. Jones to recommend another physician's assistant, and Dr. Jones recommended John Paul. Although Dr. Jones failed to inform Dr. Webb that John Paul had previously been convicted for drug offenses, he did tell Dr. Webb that John Paul had had some trouble in the

past. Dr. Webb testified unequivocally that under no circumstances was it a condition of the lease agreement that he hire John Paul. It is undisputed that Dr. Webb determined the qualifications of John Paul and hired him independent of Dr. Jones' recommendation.

The Government further claimed that Dr. Jones helped John Paul to masquerade as a physician by telling several patients at the clinic that John Paul would take care of them after Dr. Jones left the clinic. Dr. Webb testified, however, that John Paul was a qualified physician's assistant, and that it was normal procedure for a physician's assistant to see chronic patients, do blood work, perform physicals for children going to camp, and do the workups on new patients, all under the general direction of the physician. Dr. Webb testified that John Paul was a good assistant and generally correct in his diagnoses. He received no complaints about him from the patients. Although many patients at the clinic thought that John Paul was a physician, rather than a physician's assistant, there is no evidence whatsoever that Dr. Jones told his former patients that John Paul was a physician or that he knew that they thought he was. At most, the evidence demonstrates that Dr. Jones was remiss in his failure to inform the patients that Dr. Webb, and not John Paul, would be the only physician at the clinic.

One of the Government's witnesses, Michael Hultgren, testified that sometime in 1979, before Dr. Jones leased the Central Clinic to Dr. Webb, he had a conversation with Dr. Jones near the Riverside Clinic in Missouri. At that time, Dr. Jones practiced at both the Central and Riverside Clinics. Dr. Jones allegedly told Hultgren that he had some drugs that were in a sealed cabinet and that if Hultgren could sell the drugs, he could get them out of the cabinet. Dr. Jones did not identify the type of drugs, but allegedly told Hultgren that a woman named Donna used them to get high. Hultgren testified that nothing more ever came of the conversation. The Government presented no evidence that this conversation was in any manner related to the subsequent illegal activities at the Central Clinic.

Finally, the Government presented the testimony of Donna O'Brien, who sold drugs for John Paul as part of the illegal distribution plan. O'Brien testified that John Paul told her that Dr. Webb was at the Central Clinic because "they" needed a doctor at the clinic with a "number" for "a coverup," *i.e.*, that "they" needed a DEA registration number in order to obtain and prescribe controlled substances. John Paul did not, however, tell O'Brien who "they" were.

We conclude that, based upon this evidence, a jury could not properly have found Dr. Jones guilty of conspiracy beyond a reasonable doubt. The record is devoid of evidence that Dr. Jones knew or intended that John Paul would use his job at the clinic to distribute controlled substances, the alleged object of the conspiracy. Dr. Jones recommended John Paul to Dr. Webb, but the recommendation was at the request of Dr. Webb, who specifically testified that he was not required to hire John Paul as a condition of the lease. Dr. Jones knew and failed to inform Dr. Webb about John Paul's past drug offenses, but the record contains no evidence that Dr. Jones knew that John Paul would commit future offenses. Dr. Jones may have been derelict in failing to inform his patients that John Paul was not a doctor, but there is no evidence that Dr. Jones knew that John Paul would later masquerade as a physician. Dr. Jones may have broken a law when he offered to let Michael Hultgren sell drugs, but the Government presented no evidence linking this conversation with the activities that occurred later at the Central Clinic. Finally, the record contains no evidence that the "they" referred to in John Paul's conversation with Donna O'Brien included Dr. Jones.

At most, the foregoing evidence merely raises a suspicion that Dr. Jones conspired with John Paul to distribute drugs. We acknowledge that, because of the secretive nature of the crime, the evidence of a con-

spiracy will typically be largely circumstantial. Nevertheless, we cannot allow a conviction to be obtained by "piling inference upon inference." *Butler*, 494 F.2d at 1252 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)). We conclude that the evidence is insufficient to sustain Dr. Jones' conviction. Accordingly, we reverse and remand with instructions to direct a judgment of acquittal.