**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James T. ANDERSON, Phillip Cordova,
and Jon Gerald Salinas, Defendants–
Appellants.**

**Nos. 91–2238, 91–2247 and 91–2260.**

United States Court of Appeals,
Tenth Circuit.

Dec. 23, 1992.

Charles Louis Roberts, El Paso, TX, for defendant-appellant Anderson.

Mary Y.C. Han, Albuquerque, NM, for defendant-appellant Cordova.

Todd G. Hotchkiss (Timothy M. Padilla, with him on the brief) of Timothy M. Padilla & Associates, P.C., Albuquerque, NM, for defendant-appellant Salinas.

James D. Tierney, Asst. U.S. Atty. (Don J. Svet, U.S. Atty., with him on the brief), Albuquerque, NM, for plaintiff-appellee.

Before SEYMOUR, LAY,* and MOORE, Circuit Judges.

SEYMOUR, Circuit Judge.

Defendants Phillip Cordova, James Anderson, and Jon Salinas appeal their convictions for conspiracy to possess more than 100 kilograms of marijuana with the intent to distribute in violation of 21 U.S.C. § 846, and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).[1] Mr. Salinas was also convicted of the establishment of manufacturing operations in violation of 21 U.S.C. § 856. We conclude that the evidence is insufficient to support Anderson's convictions. We further conclude that be-

---

* The Honorable Donald P. Lay, United States Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Defendants argued their cases separately and have appealed individually. We consolidated the appeals for the purpose of this opinion.

cause unlawfully obtained evidence was admitted at trial, the convictions of Cordova and Salinas must also be reversed.

### I.

The government charged defendants with a conspiracy to distribute 1,968 pounds of marijuana, beginning on or about January 1, 1991, and continuing until on or about February 27, 1991.[2] The government became involved in investigating the conspiracy on February 24, 1991, when Detective James Torres began surveillance of the area where Jon Salinas lived. Agent Torres was in the area observing different targets for an unrelated investigation. He noticed a U–Haul truck backed up to the garage at 3343 Grogan, N.W. in Albuquerque, New Mexico (the Grogan residence). Upon checking, it was determined that the residence was leased to Frances Torres, Jon Salinas' wife. Agent Torres recognized Mr. Salinas as a man he had seen meeting with a primary target of the separate investigation some weeks earlier. From U–Haul records, the agents discovered that Jon Salinas leased the U–Haul on February 24th. The U–Haul was no longer at the Grogan residence on the 25th, and was found in the parking lot of a nearby shopping center around 10:20 a.m. that day.

At 2:10 p.m. on the 25th, James Anderson's vehicle was observed in the Grogan driveway. At 2:35 p.m., Mr. Anderson entered his car and drove to a bar where he met with Joe T. Cordova for approximately ten minutes. Mr. Anderson left the bar and returned to the Grogan residence. He approached the doorway of the house, but none of the surveilling officers could actually see him go inside. They testified, however, that his approach to the doorway was consistent with entering the residence.

At 2:56 p.m., Mr. Anderson left the Grogan residence, drove back to the bar, and parked next to Joe Cordova's vehicle. Mr. Anderson left his car carrying a white bowl and entered the passenger side of Joe Cordova's car. Three minutes later, Mr.

Anderson left the car without the white bowl. Both cars then left the parking lot travelling towards the Grogan residence and were stopped by uniformed police. The police found the white bowl, six ounces of marijuana, a gun, and a speed loader in Joe Cordova's vehicle. Mr. Anderson's fingerprints were found on the bowl. Joe Cordova said that Mr. Anderson "fronted" him the marijuana for his personal use. Mr. Anderson and Mr. Cordova were arrested.

Phillip Cordova was also seen leaving the Grogan residence on February 25. At 12:55 p.m., he drove his pickup truck to the grocery store where the U–Haul was parked. Although the agents lost him in the grocery store, they saw him again back at the Grogan residence a few hours later. Phillip Cordova left the Grogan residence on foot at 3:30 p.m. He walked to the shopping center and drove off in his pickup. On the way to his truck, Phillip Cordova passed within thirty yards of the arrests of Mr. Anderson and Joe Cordova.

Agent Henderson and agent Shiree, in separate cars, followed Phillip Cordova. He drove to a Wendy's fast food restaurant and ordered at the drive-thru window. He continued driving in a slow and cautious manner. The agents testified that they felt Phillip Cordova was aware of their surveillance of him. Agent Henderson testified that he stopped Mr. Cordova because he concluded that Mr. Cordova could notify persons remaining at the Grogan residence that Mr. Anderson and Joe Cordova had been stopped by the police and that the police were now following him. Agent Henderson turned on his emergency red light, and the two agents stopped Mr. Cordova in a cul-de-sac. Both agents blocked Mr. Cordova's truck with their vehicles so that he could not drive away. Agent Shiree had his gun drawn as Mr. Cordova exited his truck pursuant to Agent Henderson's request. The agents searched Phillip Cordova and then his truck. They found a U–Haul key in his back pocket and a small baggie of marijuana in his front

---

**2.** Two others were also indicted. Frances Torres, the wife of Jon Salinas, was acquitted

after trial. Joe T. Cordova (no relation to Phillip Cordova) is a fugitive.

pocket. They also found marijuana "roaches" in the ashtray. Mr. Cordova was then handcuffed and taken to the Grogan residence.

The agents back at the Grogan residence decided to secure the house pending a search warrant. In addition to the marijuana found on Phillip Cordova and Joe Cordova, the agents relied on information gathered throughout the day to conclude that exigent circumstances existed justifying the entry of the residence. Once arrested, James Anderson, Joe Cordova, and Phillip Cordova could not return to the Grogan residence, a situation which the officers believed might cause those inside to become suspicious and destroy evidence which the officers believed was in the house. Furthermore, three other men had left the Grogan residence at approximately 3:45 p.m. They were followed, one of the men had disappeared, and the other two were stopped by an agent. Due to faulty radio communications, the agent released the remaining two men. The police feared that these three men were now free to contact anyone who remained inside the Grogan residence to warn them of the law enforcement activities.

The agents entered the Grogan residence without a search warrant about 5:00 p.m. and performed a protective sweep. The officers saw marijuana in almost every room, and the smell of marijuana was noticeable throughout the house. The search warrant arrived at 7:55 p.m. The search uncovered 1,968 pounds of marijuana.

## II.

■ Mr. Anderson was convicted of conspiracy and of possession with intent to distribute. He alleges that the evidence is insufficient to support either conviction.

In reviewing a criminal conviction, we examine the evidence in the light most favorable to the Government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt.

*United States v. Kendall,* 766 F.2d 1426, 1429 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). In order to sustain a conviction for conspiracy, the government must show that there was an agreement to violate the law, that the defendant knew the essential objectives of the conspiracy, that the defendant knowingly and voluntarily took part in the conspiracy, and that the coconspirators were interdependent. *United States v. Evans,* 970 F.2d 663, 668 (10th Cir.1992). The government contends that Anderson's participation in the conspiracy is supported by the following evidence.

James Anderson was seen at the doorway of the Grogan residence twice. The second time occurred immediately prior to Mr. Anderson's meeting with Joe Cordova and giving him the white bowl filled with marijuana. A picture of Mr. Anderson with Frances Torres and Jon Salinas was found in the Grogan residence. The government introduced this evidence in order to establish the relationship among the alleged coconspirators. In addition, the government found phone numbers when searching several of the defendants and obtained the phone toll records of several defendants other than Mr. Anderson, which revealed that common numbers had been called by those defendants. Finally, one of the three men seen leaving the Grogan residence on the 25th was staying at a hotel where a message had been left for him asking him to "call James."

An alleged conspirator must have a "general awareness of both *the scope* and *the objective* of the enterprise to be regarded as a coconspirator." *Id.* at 670 (emphasis added). In *United States v. Jones,* 808 F.2d 754 (10th Cir.1987), we observed that a defendant " 'lacks the requisite criminal intent if he does not know the conspiracy's objective'; this knowledge must be shown by 'clear, unequivocal evidence.' " *Id.* at 755 (quoting *United States v. Dumas,* 688 F.2d 84, 86 (10th Cir.1982)). Furthermore, for one to be convicted of conspiracy there " 'must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy.' " *Id. See also United States v. Peveto,* 881 F.2d 844, 856

(10th Cir.1989). "It is not enough ... for the government to show only 'mere association' with conspirators ...; '[c]asual transactions' between the defendant and conspirators ...; or a buyer-seller relationship between the defendant and a member of the conspiracy." *Evans*, 970 F.2d at 669. "[T]he Government was required to show, by clear and unequivocal evidence, [Anderson's] knowledge that the object of the conspiracy was the distribution of marijuana, *and his agreement to cooperate* in achieving that object." *United States v. Austin*, 786 F.2d 986, 988 (10th Cir.1986) (emphasis added).

"[W]e cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *Id.* at 671 (quoting *United States v. Horn*, 946 F.2d 738, 741 (10th Cir.1991)). In *United States v. Esparsen*, 930 F.2d 1461, 1474 n. 14 (10th Cir.1991), we distinguished the defendant's activities, which we held to constitute behavior sufficient to affirm his conspiracy conviction, from the behavior of the defendants in Tenth Circuit cases whose conspiracy convictions were overturned. We noted that we have "reversed conspiracy convictions because the evidence created only a suspicion of association with criminal activities." *Id.* In *Esparsen*, there was evidence of multiple negotiations and drug transactions involving the defendants and undercover police officers over several months. Quoting from *Esparsen*, we said in *Evans* that "[a]n agreement to distribute drugs can sometimes 'rationally be inferred' from 'frequent contacts' among the defendants and from 'their joint appearances at transactions and negotiations.'" *Evans*, 970 F.2d at 669.

In *United States v. McIntyre*, 836 F.2d 467 (10th Cir.1987), we reversed the conspiracy conviction of defendant McIntyre. Mr. McIntyre purchased cocaine from a government informer and subsequently shared the purchase with those present at the transaction. Mr. McIntyre also had conversations with the informant concerning his sources for drugs in Tulsa, Oklahoma, and the informant and Mr. McIntyre together made a purchase. After noting that " 'proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy,' " *McIntyre*, 836 F.2d at 471 (quoting *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979)), we held that there was no evidence of a conspiracy. "The important question," we said, is whether a transaction constitutes an "essential and integral step[ ] toward the realization of a common, illicit goal." *Id.* (quoting *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985)).

The government in the present case did not employ an informant or manage any controlled buys. The absence of an informant was most likely due to the agents serendipitously arriving in the neighborhood of the Grogan residence and the rapidity with which the activities unfolded. As a result, however, there was no inside knowledge flowing to the agents to assist them in their investigation. Information gathered by informants and undercover agents solidifies the evidence against each particular defendant who is charged, reinforcing the principle that "guilt remains individual and personal." *United States v. Kotteakos*, 328 U.S. 750, 772, 66 S.Ct. 1239, 1251, 90 L.Ed. 1557 (1946).

No informant, undercover agent, or co-conspirator testified regarding Mr. Anderson's involvement in the conspiracy. Mr. Anderson may well have been convicted of conspiracy because of his misfortune to conduct a one-time transaction at the Grogan residence on this particular day. The evidence only established Mr. Anderson's single delivery of six ounces of marijuana to Joe Cordova for personal use. This transaction does not show that Mr. Anderson knew of the essential objectives or the scope of the conspiracy, or that he knowingly and voluntarily became a part of it. *Evans*, 970 F.2d at 668. In order to convict Mr. Anderson of conspiracy, we would have to pile inference on inference, inferring first that he entered the house,

that he knew the house contained large quantities of marijuana in the bedrooms, that he got the six ounces of marijuana at the house, and that this was not a one-time purchase but instead that there was a meeting of his mind with at least one other conspirator to possess a large quantity of marijuana with the intent to distribute it for profit.[3]

We refused to make a series of such inferences in *Evans.* The defendant there, Ms. Brice, purchased crack cocaine once and loaned scales for weighing cocaine to other coconspirators. We reversed her conviction for conspiracy to possess and to distribute crack cocaine not only because the evidence did "not establish that Brice shared in the common distribution objective of the conspiracy" since she did not resell the crack she purchased, but also because the loaning of the scales was "one isolated occasion," an act which "could have been merely a gratuitous favor or isolated act among friends." *Id.* at 673. In the present case, Mr. Anderson, who knew the other defendants, was discovered in one isolated act of delivering six ounces of marijuana. Unlike the defendant in *Evans,* there is no evidence that Mr. Anderson purchased illegal drugs. Mr. Anderson delivered a small quantity of marijuana, while Ms. Brice loaned scales she knew were to be used in the weighing of cocaine, an act commonly associated with the eventual partitioning and distributing of the drug. We nevertheless refused to "presume that Brice was aware of the scope of [the] conspiracy because there was no evidence that she attended meetings wherein other transactions were discussed." *Id.*

As we articulated in *Evans,* it is "essential to determine what kind of agreement or understanding existed as to *each* defendant." *Evans,* 970 F.2d at 673 (emphasis added). "The best way to assess a defendant's intended involvement in a conspiracy is to examine the conspiracy from [each] defendant's point of view. What exactly did [Mr. Anderson] think [he] was joining?" *Id.* at 674. On this record, there is a failure of proof from which a jury could find beyond a reasonable doubt that Mr. Anderson was involved in a conspiracy to possess 1,968 pounds of marijuana with the intent to distribute it. We must therefore reverse Mr. Anderson's conspiracy conviction.

■ The lack of evidence to support Mr. Anderson's conspiracy conviction is equally dispositive of his claim that the evidence was insufficient to affirm his conviction for possession of the 1,968 pounds of marijuana with intent to distribute. The government argues on appeal that the possession conviction should be sustained because the evidence establishes that Anderson was an "active co-conspirator[ ] in the distribution of more than 100 kilograms of marijuana" and that Anderson therefore "had joint constructive possession of all the marijuana contained inside the residence." Amended Consolidated Brief of Appellee, at 52. The government thus contends that joint constructive possession of the marijuana can be imputed to Anderson by virtue of his status as a coconspirator. Given our holding that Anderson's conspiracy conviction cannot stand, his conviction for possession of 1,968 pounds of marijuana is likewise not sustainable.

### III.

■ Phillip Cordova was also convicted of conspiracy and possession. He filed a pretrial motion contending that his arrest was not supported by probable cause and that the evidence seized from his person and his truck should have been suppressed. The government argued that probable cause to arrest was present and, in the alternative, that there was reasonable suspicion supporting an investigatory stop of Mr. Cordova. The district court denied the

---

3. We note that Mr. Anderson was charged with conspiracy to *possess* more than 100 kilograms of marijuana. There is no evidence in this record that Mr. Anderson was involved in the purchase of the 1,968 pounds of marijuana, or its delivery to the house. There is likewise no evidence that he was involved in the negotiation for the purchase or delivery of the marijuana to the house, and no evidence that he had any ownership or other interest in the house where the marijuana was stored.

suppression motion, concluding that the initial stop constituted an arrest but that it was supported by probable cause.

"In reviewing denial of a motion to suppress we accept the trial court's findings of fact unless they are clearly erroneous. Additionally, we must view the evidence on appeal in the light most favorable to the government." *United States v. Pena*, 920 F.2d 1509, 1513 (10th Cir.1990) (citation omitted). "The ultimate determination of reasonableness under the fourth amendment is, however, a conclusion of law that we review de novo." *United States v. McKinnell*, 888 F.2d 669, 672 (10th Cir. 1989) (citation omitted); *see also United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir.1992); *Pena*, 920 F.2d at 1513–14.

Mr. Cordova was stopped in a cul-de-sac. Two agents in separate cars blocked his egress. One agent approached with his gun drawn. Agent Henderson testified at the suppression hearing that Mr. Cordova was in fact *not* free to leave. Rec., vol. II, at 178. The district court's determination that Mr. Cordova was arrested is not clearly erroneous given the circumstances of the stop in the cul-de-sac and the objectively reasonable belief that one stopped in this situation is not free to leave.

■ However, we do not agree with the district court that the arrest was supported by probable cause. In order for a warrantless arrest to be lawful, the Fourth Amendment requires that an officer have probable cause. Probable cause to arrest exists when the facts and circumstances are such that a reasonable officer would believe that an offense has been or is being committed. *See Brierly v. Schoenfeld*, 781 F.2d 838, 841 n. 1 (10th Cir.1986). The district court did not identify the particular facts upon which it relied in holding that there was a sufficient basis for the arrest. *See* rec., Ruling on Suppression Motion, June 27, 1991, at 16. The government maintains

that probable cause existed based on the following facts: at 12:55 p.m., Phillip Cordova's pickup was parked outside the Grogan residence; Mr. Cordova left the Grogan residence and parked at the shopping center where the U–Haul truck was parked; a few hours later, Mr. Cordova was seen leaving the Grogan residence on foot and he passed within thirty yards of the arrests of Mr. Anderson and Joe Cordova. Given the other activities during the day concerning the Grogan residence and the U–Haul, the government contends that the facts establish probable cause to arrest Mr. Cordova.[4]

Even assuming that these facts are enough to raise an agent's reasonable suspicion of illegal activity, we hold that they do not constitute probable cause justifying the arrest of Phillip Cordova. Although Mr. Cordova showed some association with the Grogan residence, he did not otherwise take actions that would warrant believing he had committed or was committing a crime. He parked his truck at a shopping center and retrieved it several hours later. He drove slowly and cautiously, stopping to eat at a Wendy's, and he was then arrested. We hold that probable cause to arrest Mr. Cordova did not exist and that the evidence seized from him should have been suppressed. Because the admission of this evidence cannot be viewed as harmless, Mr. Cordova's convictions must be reversed.[5]

## IV.

■ Jon Salinas, a resident of 3343 Grogan, N.W., contends the government did not establish that exigent circumstances existed to justify the warrantless entry into his home, and that the evidence seized as a result of the warrantless search should therefore have been suppressed. The district court's finding of exigent circumstances was based on its determination that Phillip Cordova and/or the three other indi-

---

**4.** After finding that the stop was an arrest supported by probable cause, the court further found that, following his arrest, Mr. Cordova consented to the search of his person and his truck. The government does not argue on appeal that, if we hold the arrest improper due to

lack of probable cause, Mr. Cordova's consent was nonetheless valid.

**5.** Mr. Cordova's further arguments need not be addressed as a result of our determination that the agents lacked probable cause to arrest him.

viduals who left the Grogan residence could have alerted anyone who might have been present in the residence to the fact of police surveillance, in which event evidence in the house could have been destroyed.

We begin by noting that "[i]t is a basic 'principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 589–90, 100 S.Ct. at 1382 (1980); *see also United States v. Maez,* 872 F.2d 1444, 1450–51 (10th Cir. 1989); *United States v. Aquino,* 836 F.2d 1268, 1271–72 (10th Cir.1988); *United States v. Morgan,* 743 F.2d 1158, 1161 (6th Cir.1984).

■ Under *Payton,* then, police may enter a home without a warrant only when exigent circumstances are present. We have defined exigent circumstances as arising when

(1) the law enforcement officers ... have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search [is not] motivated by an intent to arrest and seize evidence, and (3) there [is] *some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.*

*United States v. Smith,* 797 F.2d 836, 840 (10th Cir.1986) (emphasis added); *see also Aquino,* 836 F.2d at 1271–72. As an exception to the warrant requirement, exigent circumstances must be "jealously and carefully drawn." *Aquino,* 836 F.2d at 1270; *Smith,* 797 F.2d at 841.

[B]ecause each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and "the burden is on those seeking the exemption to show the need for it."

*Smith,* 797 F.2d at 841 (citations omitted).

■ The government's burden of establishing that sufficient exigent circumstances exist to justify a warrantless entry "is particularly heavy where the police seek to enter a suspect's home ... because warrantless seizures inside a home are presumptively unreasonable." *Maez,* 872 F.2d at 1452; *see also Aquino,* 836 F.2d at 1271. The existence of exigent circumstances is a mixed question of law and fact. *See United States v. Stewart,* 867 F.2d 581, 584 (10th Cir.1989). Although we accept underlying fact findings unless they are clearly erroneous, "the determination of whether those facts satisfy the legal test of exigency is subject to de novo review." *Id.*

"A warrantless entry to prevent the loss or destruction of evidence is justified, if the government demonstrates: (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent." *United States v. Radka,* 904 F.2d 357, 362 (6th Cir.1990); *see also United States v. Cuaron,* 700 F.2d 582, 586 (10th Cir.1983). Exigent circumstances would have existed here if the officers were reasonable in believing that someone was still in the house. On the record before us, we conclude there is no evidence showing such a belief to be reasonable.

The government argues that its surveillance of the house was noncontinuous and that during a lapse in surveillance someone could have entered the home. However, the record reflects that the residence was covered for practically the entire time period in question. In *United States v. Straughter,* 950 F.2d 1223 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1238, 117 L.Ed.2d 471, —— U.S. ——, 112 S.Ct. 1505, 117 L.Ed.2d 643, —— U.S. ——, 112 S.Ct. 1601, 118 L.Ed.2d 315 (1992), the police were unable to cover all sides of an apartment and had also interrupted their surveillance briefly to follow suspects. The Sixth Circuit held that the "inability of the police to watch all of the doors of the

apartment all of the time cannot support a reasonable belief that third parties were inside.... [T]he officers' reasonable belief that there was a large quantity of cocaine in the apartment, coupled with their speculation that it would not be left unguarded, fails to support a reasonable belief that there were third persons in the apartment." *Id.* at 1231.

■■■ We agree with the reasoning of the Sixth Circuit that a lapse in surveillance is not sufficient to carry the government's burden. The happenstance that the police are unable to completely cover a residence does not, without more, support a reasonable belief that others are inside the residence justifying a warrantless entry.[6] Even if the agents in the present case had probable cause to believe that drugs were in the Grogan residence, but see *infra*, the officers' belief that contraband is present cannot, without more, serve as a basis for a warrantless entry and search. As the court pointed out in *Straughter*, "[t]he government [would be] bootstrap[ping] its reasonable belief that there was evidence in the apartment into a reasonable belief that there were third parties in the apartment." *Id.* at 1231. The Fourth Amendment guards against such "bootstrap" arguments serving as a basis for the warrantless search of a person's home. Thus, no exigent circumstances supported the warrantless search of the Grogan residence.

■■■ The government argues that assuming the evidence was obtained from an illegal warrantless search, it nonetheless is not automatically precluded from admission into evidence. The government maintains that if the tainted evidence of the marijuana found in the house is excised from the affidavit, it still contains sufficient probable cause to support a warrant for the subsequent search of the Grogan residence. We determine whether the "search warrant was issued upon probable

cause as supported by facts 'untainted' by the prior illegality." *United States v. Driver*, 776 F.2d 807, 812 (9th Cir.1985) (citing *United States v. Giordano*, 416 U.S. 505, 554–56, 94 S.Ct. 1820, 1845–46, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part)). *See also United States v. Johnston*, 876 F.2d 589, 592 (7th Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989); *United States v. Williams*, 633 F.2d 742, 745 (8th Cir.1980); and *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.1987). In addressing a challenge to the sufficiency of an affidavit, we must ensure that the magistrate issuing the warrant had a "substantial basis" for concluding that probable cause existed. *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir.1986) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit[,] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

Viewing the affidavit for the search warrant absent the tainted evidence, we hold that this warrant is not supported by probable cause. The government contends that the excised affidavit establishes probable cause based on the following: a known distributor of narcotics called the Grogan residence once two months earlier; Frances Torres worked at one of a chain of restaurants owned by a target of a drug investigation; the observations of the U–Haul truck; the movements of James Anderson leaving the residence twice and later being arrested after delivering a white bowl of marijuana to Joe Cordova; an unusual amount of foot traffic at the residence; and a trained dog who alerted the officers to the presence of drugs in the U–Haul.

---

**6.** This case is distinguishable from other cases in this circuit which raise the question of exigent circumstances justifying a warrantless entry in order to protect evidence from being destroyed. *See United States v. Chavez*, 812 F.2d 1295 (10th Cir.1987); *United States v. Ma-* *bry*, 809 F.2d 671 (10th Cir.1987); *United States v. Cuaron*, 700 F.2d 582 (10th Cir.1983). In those cases, the agents not only had probable cause to believe drugs were in the residence, but also had actual knowledge of persons inside who could destroy the drugs.

 As an initial matter, we strike the evidence of the drug-sniffing dog. It cannot be included in a determination of probable cause because it too is tainted evidence. The affidavit for the warrant stated that the officers did not take the dog to the U–Haul at the shopping center until after the residence was secured and the officers had knowledge of the marijuana inside the house.

The other facts presented simply are not adequate to establish a substantial basis for concluding that probable cause existed to search the Grogan residence. The only untainted evidence of drugs were the statements concerning the white bowl containing marijuana Mr. Anderson gave to Joe Cordova. Significantly, however, no officer or agent could testify to seeing Mr. Anderson leave the Grogan residence *with* the white bowl. Thus, the excised affidavit contains no untainted statements tending to link the presence of drugs with the Grogan residence. *Compare, e.g., Shomo,* 786 F.2d at 984 (substantial basis for finding probable cause to search residence for gun when resident seen leaving his home with gun in his possession).

We therefore hold that the evidence seized from the Grogan residence as a result of the sanitized search warrant should have been suppressed. We further conclude that the admission of the evidence was not harmless error. Mr. Salinas' convictions for conspiracy, possession, and establishment of drug operations are accordingly REVERSED.

## V.

In summary, James Anderson's convictions for possession and for conspiracy are REVERSED. Phillip Cordova's convictions for conspiracy and possession, and Jon Salinas' convictions for conspiracy, possession, and establishment of operations, are REVERSED and REMANDED for further proceedings to determine whether the government has sufficient evidence after the suppressions to retry these defendants.

THE MANDATE SHALL ISSUE FORTHWITH.