UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Paul GIROLAMO, aka Bari
Mascitti, Defendant–Appellant.

No. 93–2151.

United States Court of Appeals,
Tenth Circuit.

May 2, 1994.

Presiliano A. Torrez, Asst. U.S. Atty. (Larry Gomez, U.S. Atty., with him on the brief), Albuquerque, NM, for appellee.

Roger A. Finzel, Asst. Federal Public Defender, Albuquerque, NM, for appellant.

Before EBEL, Circuit Judge, GODBOLD,* Senior Circuit Judge, and BARRETT, Senior Circuit Judge.

BARRETT, Senior Circuit Judge.

Richard Paul Girolamo appeals from the judgment and sentence entered pursuant to his conditional plea of guilty to the charge of possession with intent to distribute less than fifty (50) kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D).

Girolamo was indicted on September 2, 1992. Following initial appearances before a magistrate judge, his case was assigned to District Judge John E. Conway, United States District Court for the District of New Mexico.

_____

* The Honorable John C. Godbold, Senior United States Circuit Judge for the Eleventh Circuit, sitting by designation.

Prior to trial, Girolamo moved to suppress "[a]ny and all items seized from the defendant on an Amtrak train on Wednesday, August 5, 1992, at the Albuquerque Amtrak Train Station." (R., Vol. I, Item 16 at 1). The motion hearing was held on January 22, 1993. Judge Conway, although present in the courtroom, did not preside over the hearing. Rather, Circuit Judge Paul J. Kelly, Jr., of the United States Court of Appeals, Tenth Judicial Circuit, presided. Girolamo's counsel was not notified prior to the hearing that Judge Kelly, who was unknown to him, would preside at the motion hearing. Judge Kelly did not introduce himself nor was there any explanation as to why he was presiding.

Following a recess in the hearing during which Girolamo's counsel became aware of Judge Kelly's identity, the following colloquy occurred:

MR. FINZEL (Defense Counsel): Also, for the record, I am personally a new Assistant Federal Public Defender. I'm flattered at your presence, Your Honor.

THE COURT: Thank you.

MR. FINZEL: At the same time, I have to ask how did it come about that you're here. Pursuant to the statute or what?

THE COURT: I'm designated as a District Judge in this district.

MR. FINZEL: Thank you, Your Honor. And again, I'm flattered.

(R., Vol. II at 98).

Defense counsel did not object to Judge Kelly presiding. At the conclusion of the hearing, Judge Kelly found that, after "[i]ndulging every reasonable presumption against a waiver, ... the evidence adduced here today was convincing and that the government's [sic] proved that consent was given to search this luggage without duress, without coercion, express or implied." (R., Vol. II at 167). Thereafter, Judge Kelly entered a minute order denying Girolamo's motion to suppress.

Girolamo's case was called to trial on January 25, 1993, with Judge Conway presiding. At that time, Girolamo moved the court to "strike or otherwise vacate the hearing, the conclusions of law, and the findings of fact and the opinion issued by the Honorable Judge Kelly sitting by designation." (R., Vol. I, Item 46 at 5–6). Judge Conway denied the motion to strike. Thereafter, Girolamo entered into a memorandum of understanding regarding a guilty plea. Within the memorandum, Girolamo agreed to plead guilty as charged, reserving the right "to appeal the adverse ruling on the motion to suppress heard by the Honorable Judge Paul Kelly ... [and reserving] the right to appeal the adverse ruling concerning the designation and authority of the Honorable Judge Kelly ... to hear the motion to suppress." (R., Vol. I, Item 43 at 1).

Girolamo then filed a motion requesting that Judge Conway reconsider his denial of his motion to strike the ruling of Judge Kelly. Within his motion, Girolamo acknowledged that under 28 U.S.C. § 291(b) the chief judge of a circuit "may, in the public interest, designate and assign temporarily any circuit judge within the circuit ... to hold a district court in any district within the circuit."

Girolamo argued that "the legality of the designation of a judge [under § 291(b) ] to a given situation is narrowed by a consideration of whether or not that appointment actually served the purpose of the legislation," (R., Vol. I, Item 46 at 4), i.e., "to allow circuit judges to assist in clearing backlogs of cases as they develop," *id.* at 2, and to "achieve the swift execution of justice." *Id.* at 3. Girolamo further contended that the purpose of the legislation was not met here since "[t]here is nothing in the record to indicate that there was a backlog of cases or that Judge Conway needed assistance to resolve this particular motion on that particular day," *id.* at 5, and, "[o]n the contrary, Judge Conway was observed, at least for part of the proceeding to be sitting in the back of the courtroom observing the proceeding." *Id.* Judge Conway subsequently entered a minute order denying Girolamo's motion to reconsider.

On appeal, Girolamo contends that (1) a circuit judge is not authorized to displace an available sitting district judge to conduct a single hearing in a pending case, and (2) he was seized without reasonable suspicion.

## I.

■ Girolamo contends that a circuit judge is not authorized to displace an available sitting district judge to conduct a single hearing in a pending case.

Section 291(b) provides that the "chief judge of a circuit ... may, in the public interest, designate and assign temporarily any circuit judge within the circuit ... to hold a district court in any district within the circuit." On December 11, 1992, Chief Judge Monroe G. McKay, United States Court of Appeals for the Tenth Circuit, executed the following designation:

### DESIGNATION OF TENTH CIRCUIT JUDGES FOR SERVICE IN DISTRICT COURTS WITHIN THE TENTH CIRCUIT

Whereas, in my judgment the public interest so requires; now therefore, pursuant to the authority vested in me by Title 28, United States Code, Section 291(b), as amended April 2, 1982, I do hereby designate and assign the following Judges of the United States Court of Appeals for the Tenth Circuit to hold District Courts in the Districts in said Circuit listed opposite their names, during the period beginning January 1, 1993, and ending December 31, 1993 ...:

\* \* \* \* \* \*

Paul J. Kelly, Jr.—District of New Mexico (Appellant's Brief–in–Chief, Attachment D).

Girolamo argues that § 291(b) "empowers the judges so assigned to exercise the authority which inheres in district court judges, no more and no less." (Appellant's Brief-in-Chief at 13). Girolamo further argues that because his case was assigned to Judge Conway, who handled the case before and after the suppression hearing, and because Judge Conway was present during the suppression hearing and there was no death, sickness or other disability on his part which would have otherwise permitted reassignment of the case under Fed.R.Crim.P. 25(a)[1], the unan-

nounced reassignment of the suppression motion hearing to Judge Kelly was contrary to law and his order of suppression should be vacated. Girolamo did not point out that Rule 25(a) applies only after a jury trial has commenced.

Girolamo cites *In re Chicago, R.I. & P. Ry. Co.*, 162 F.2d 606 (7th Cir.1947), arguing that it "dealt with precisely the question raised herein, namely, is the chief circuit judge authorized to designate a circuit judge to sit in a pending district court case and thereby displace a sitting district judge." (Appellant's Brief-in-Chief at 13). Girolamo contends that the holding in *In re Chicago* that it was not "contemplated, [n]or was the authority conveyed to the senior circuit judge, to assign a judge to sit in a cause where another judge was sitting," applies to this case. 162 F.2d at 611–12

Girolamo also cites *Cruz v. Abbate*, 812 F.2d 571, 574 (9th Cir.1987), for the proposition that courts "must take great pains to avoid any inference that assignments are being made for an improper purpose, particularly where criminal cases are concerned.... The suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow...." Girolamo concludes by arguing:

Obviously, the efficient administration of justice is not served by the displacement of an available assigned judge, who is seated in the back of the courtroom while another judge conducts a hearing. No legitimate reason for the change from Judge Conway to Judge Kelly, then back to Judge Conway, is apparent in the record of this case. The appearance of impropriety is unmistakable. Judge Kelly's displacement of Judge Conway was unauthorized and contrary to law; his order denying Girolamo's suppression motion must therefore be vacated.

(Appellant's Reply Brief at 6).

The government points out that Judge Kelly was authorized by Chief Judge

---

**1.** Rule 25(a) provides: "If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or assigned to the court upon certifying familiarity with the record on the trial, may proceed with and finish the trial."

McKay's December 11, 1992, designation, *supra,* to hear and conduct the hearing on the motion to suppress, and that *In re Chicago* is distinguishable since here "[t]here is no effort on the part of the circuit judge to displace another at the behest of one of the parties." (Brief of Appellee at 27). The government argues that "Girolamo does not allege [that] bias or prejudice entered into the rulings of the court," *id.,* and "it would be inappropriate in this case to strike Judge Kelly's ruling, since there has been no showing that any substantial rights of the defendants were violated." *Id.* at 28. We agree.

A § 291(b) designation is discretionary with the chief judge of a circuit or the circuit justice. *See Johnson v. Manhattan Railway Co.,* 289 U.S. 479, 501, 53 S.Ct. 721, 729, 77 L.Ed. 1331 (1933) (considering 28 U.S.C. § 22, the predecessor to § 291(b)). Moreover, Girolamo had no right to have a particular Article III judge preside nor has he made any showing of bias or prejudice. Accordingly, we hold that Judge Kelly, having been properly assigned and designated by Chief Judge McKay in accordance with § 291(b) to hold district court within the District of New Mexico "during the period beginning January 1, 1993, and ending December 31, 1993," lawfully presided over the January 22, 1993, suppression hearing.

With this in mind, however, we observe that although Judge Kelly was presiding with the implicit consent of Judge Conway, who was present as an observer during a portion of the hearing, Girolamo's counsel was not notified that Judge Kelly would preside. At the commencement of the hearing, Judge Kelly was unknown to Girolamo's counsel and the record does not indicate that Judge Kelly introduced himself or explained why he was presiding. Perhaps a more informing procedure would be for the district court judge to whom a case is assigned to enter a written order notifying the parties whenever another Article III judge will preside over a pre-trial matter.

## II.

Girolamo contends that he was seized without reasonable suspicion. A detailed summary of the suppression hearing testimony given by Officer Candelaria and Girolamo follows.

### *Testimony of Officer Candelaria*

On August 5, 1993, Candelaria, a detective with the Albuquerque Police Department assigned to the Drug Enforcement Administration (DEA) working with a drug interdiction unit, boarded an eastbound Amtrak passenger train during its scheduled stop in Albuquerque. Candelaria had been with the Albuquerque Police Department approximately fourteen years, involved with drug investigations for approximately nine years during which he had worked on hundreds of cases, and had served as the agent in charge or the assisting agent in 50 to 60 drug interdiction cases.

Knowing that most drug couriers occupy economy or deluxe sleeping compartments when traveling by train, Candelaria had, prior to boarding the Amtrak train, reviewed a manifest of all the passengers occupying sleeping cars. In so doing, Candelaria noted a one-way reservation under the name of Bari Mascitti for an economy sleeping compartment from San Diego, California, a drug source city, to New York City, a drug destination city. When he called the home callback telephone number which was listed on the Mascitti reservation, he was advised that Mascitti was on a train en route to New York City.

A name check with the Narcotics and Dangerous Drugs Information System (NADDIS) produced an entry under the name of Bari Mascitti. The NADDIS printout indicated an involvement with narcotics trafficking and an organized crime family of New York.

After boarding the train, Candelaria approached the economy sleeping compartment reserved under the name of Bari Mascitti. The compartment was approximately three feet by six feet and included two sets of seats which could be slid together to make upper and lower level beds. When the lower seats are slid together to make a bed, there is no floor space on which to walk around and one could only exit the compartment by hopping out through the compartment's sliding door.

Candelaria approached the Mascitti compartment and knocked on the door. When no one answered, he left the area. Candelaria returned around 2:30 p.m. The passenger in the compartment across the aisle-way from Girolamo was seated in his compartment with his door open and people were walking down the aisle-way going to and from the diner portion of the train. Candelaria stepped to the right of the compartment's doorway, thereby affording the compartment's occupants access to the aisle-way and the stairway leading out of the train, and knocked on the door a second time. Girolamo opened the curtain and the compartment's sliding door. Girolamo was lying down on the lower bed with a large black duffle bag at his feet at the foot of the bed. A smaller toiletry bag was nearby.

Candelaria remained standing to the right of the doorway. He did not enter the compartment when he identified himself as a police officer and asked Girolamo if he could speak with him. Girolamo agreed. Candelaria asked to see a ticket and some identification. Girolamo produced a ticket in the name of Bari Mascitti and a Pennsylvania driver license in the name of Richard Girolamo. Girolamo told Candelaria that Mascitti was his father-in-law and that Mascitti had purchased the train ticket for him.

Candelaria informed Girolamo that he was working a drug interdiction program on Amtrak because there was a problem with people transporting narcotics on the trains. Candelaria then inquired if Girolamo owned the luggage, including the large black duffle bag. Girolamo responded affirmatively. Candelaria then inquired if he could search Girolamo's duffle bag. Girolamo responded "sure" and asked why.

Candelaria again advised Girolamo that he worked a drug interdiction program on the train. Girolamo then handed Candelaria the toiletry bag. Candelaria examined it and then returned it to Girolamo. Girolamo then removed a set of keys from his pocket, unlocked the padlock on the large black duffel bag, and unzipped it, exposing a second blue duffle bag. Once the black duffle bag was unzipped, Candelaria detected an odor of raw marijuana coming from within the bag. At no time had Candelaria, who was carrying a weapon concealed in a fanny pack, displayed a weapon. Furthermore, Candelaria was the only officer interacting with Girolamo.

On cross-examination, Candelaria testified that he did not stand in front of Girolamo's open compartment door while questioning him. Rather, at all times, he questioned him while standing off to the side of the open door out of concern for his own safety and to afford Girolamo the opportunity, if he wished, to leave at any time via the aisle-way or the stairs. During the questioning, people were passing back and forth in the train aisle-way in front of Girolamo's compartment and unknown voices were heard in the background. Candelaria acknowledged that Girolamo's travel by train in an economy sleeping compartment from San Diego to New York City was consistent with innocent travel. Candelaria did not apprise Girolamo that he did not have to talk to him nor did he tell Girolamo that he did not have to allow him to look in his luggage. Moreover, Candelaria did not tell Girolamo that he could get up and go.

### Testimony of Richard Girolamo

Girolamo was traveling to New York City on Amtrak to pick up two Harley Davidson motorcycles and some personal belongings. He intended to return to California by truck. The Amtrak ticket was in the name of his future father-in-law, Bari Mascitti, because Mascitti had the time to pick it up. Amtrak required the person picking up a ticket to sign the ticket and show identification.

Girolamo had gone to sleep in his compartment after lunch before the train stopped in Albuquerque. He was awakened by a knocking on his door; he assumed it was the attendant who had made previous inquiries to determine if he had everything he needed. Being groggy, he didn't answer the door. When he later heard another knock at the door, he pulled back the curtain, saw an officer displaying a police shield, and opened the door. He opened the door because there was a police officer there and it was a normal response in that circumstance. Girolamo did not think the officer would go away if he pulled the curtains.

When Candelaria identified himself and inquired if he could speak to him, Girolamo responded that he could. Although Girolamo was groggy, he answered Candelaria's questions about where he was from and where he was going. When Candelaria asked to see his ticket, he complied and explained that he was Richard Girolamo and not Mascitti, but that Mascitti had picked up the ticket for him. When Candelaria asked for some identification, he gave him his Pennsylvania driver license.

After Candelaria related that he was working with a drug interdiction program on Amtrak, Girolamo believed that he was being pressured. He did not know what to say and decided that he had to keep his cool. He had previous encounters with police and had gotten hurt before. When Candelaria asked him if he would voluntarily consent to a search of his items, he remarked that he did not see any reason for it. However, he felt he did not have any choice but to let Candelaria search his items; he felt he had to let him do it.

At the beginning of the questioning on the train, Candelaria was standing by the right side of the door within the doorway. He felt nervous about having Candelaria so close to him because he had been beat up by police officers a number of times. He did not remember saying "sure" when Candelaria asked if he could search his items and did not believe he had said that. If Candelaria had stated that Girolamo could refuse to let him look at his luggage, Girolamo never would have opened the luggage. Girolamo opened his luggage because he did not believe he had any choice in the matter.

On cross-examination, Girolamo acknowledged that the marijuana and bag were his. He also acknowledged numerous prior arrests and having been charged with minor offenses. Girolamo realized that his appearance was similar to that of a gangland member and that people judged him by his long hair and tattoo on his right eye. Girolamo knew that he could be intimidating and that he had intimidated Candelaria to the degree that Candelaria felt he had to be a little more forceful. Girolamo cordially answered all of Candelaria's questions and maintained himself like a gentleman so he would not get hurt. Girolamo had noticed that Candelaria was getting nervous and it was plain to him that Candelaria was threatened by him. (Girolamo was approximately 5' 10" tall and weighed approximately 230 pounds and Candelaria was approximately 5'7½" tall and weighed approximately 150 to 155 pounds). Candelaria's nervousness made Girolamo nervous.

On redirect examination, Girolamo stated that when Candelaria came to his compartment and woke him, he did not feel that he could just walk out and leave nor did he feel that he could simply tell Candelaria to leave.

Based on this testimony, and cited case law, Girolamo argues that he was seized without reasonable suspicion, that his encounter with Officer Candelaria constituted an investigative detention to which he did not voluntarily consent and that his subsequent consent to the luggage search was tainted by his prior illegal seizure.

Girolamo relies upon *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) for the proposition that a person has been seized for purposes of the Fourth Amendment when "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at ——, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)). Girolamo contends that when our holdings in *United States v. Ward*, 961 F.2d 1526 (10th Cir. 1992), *United States v. Bloom*, 975 F.2d 1447 (10th Cir.1992), and *United States v. Hall*, 978 F.2d 616 (10th Cir.1992), are considered together, "they compel the conclusion that the district court erred in ruling that Girolamo's encounter with officers was purely consensual. Rather, a seizure occurred when Candelaria, without advising Girolamo of his right to terminate the encounter, informed Girolamo that he was looking for drugs and began to question him about his luggage." (Appellant's Brief-in-Chief at 16–17).

The government responds that Girolamo was not seized, inasmuch as he agreed to speak with Candelaria and consented to the

interview. Under such circumstances, the government contends, quoting *Bostick*, that "[a] seizure does not occur because a police officer approaches an individual and asks a few questions," and that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ... [including] request[ing] consent to search his or her luggage." 501 U.S. at ——, 111 S.Ct. at 2386. The government contends that under *Bostick*, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at ——, 111 S.Ct. at 2387.

■ In reviewing the denial of a motion to suppress, we accept the trial court's findings of fact unless they are clearly erroneous. *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir.1993); *United States v. Anderson*, 981 F.2d 1560, 1566 (10th Cir. 1992). In so doing, we must view the evidence on appeal in the light most favorable to the government. *Id.* We review *de novo* the "ultimate determination of Fourth Amendment reasonableness." *United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir.1993). The proponent of a motion to suppress bears the burden of proof. *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir.1991).

■ After this case was argued on November 10, 1993, the clerk of court notified the parties that we would withhold our opinion awaiting this court's opinion in *United States v. Little*, 18 F.3d 1449 (10th Cir.1994) (en banc).

In *Little*, the district court, in reliance on *Ward*, found that defendant Little had a higher expectation of privacy while occupying a private train (Amtrak) roomette than an individual traveling in a public passenger train and that the DEA agent's questioning of Little near the opened door of the roomette from the hallway (which the district court described as a confined space away from the public) was, in effect, a situation where she was not permitted to decline answering questions. *Id.* at 1502–03. The court also relied on *Ward* when observing that Little had not been advised by the agent that she could terminate the encounter while being asked incriminating questions. *Id.* at

1501–02. Relying upon *Ward*'s holding that an individual traveling in a private train roomette has a higher expectation of privacy than an individual traveling in a public passenger train, the court held that Little was seized in violation of the Fourth Amendment. *Id.* at 1503–04. Further, the court concluded that the DEA agent lacked reasonable suspicion to conclude that Little's luggage contained narcotics, so as to justify a brief detention of the luggage subject to a dog sniff. *Id.* at 1502–03.

On appeal, the government, in *Little*, urged that we reverse the district court's order granting the motion to suppress, contending that the encounter between the DEA agent and Little was consensual and that the agent had reasonable suspicion to detain her luggage and subject it to a dog sniff. *Id.* We reversed the district court's order granting the motion to suppress. *Id.* at 1501–02, 1506.

This court, in *Little*, first observed that the district court and other district courts had concluded that *Ward* and *Bloom* established a *per se* rule that encounters between police and a citizen inside train roomettes constituted seizures in violation of the Fourth Amendment. *Id.* at 1501–02, 1503–04. We rejected the proposition that the location of the encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question, and held that any implication to the contrary from our previous opinions was overruled. *Id.* at 1503–04. Instead, we applied the "necessarily imprecise," *Michigan*, 486 U.S. at 573, 108 S.Ct. at 1979, test set forth in *Bostick*, for determining whether a seizure has occurred implicating the Fourth Amendment or whether the encounter is consensual:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Little,* 18 F.3d at 1503 (quoting *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2389).

In *Little,* applying the *Bostick* totality of the circumstances test, we pointed out that *Bostick* explicitly stated that "[w]here the encounter takes place is one factor, but it is not the only one." *Little,* 18 F.3d at 1503 (quoting *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2387). We pointed to *Michigan* for the rule that the focus is on "the coercive effect of police conduct, taken as a whole," on a reasonable person. *Little,* 18 F.3d at 1504 (quoting *Michigan,* 486 U.S. at 573–74, 108 S.Ct. at 1979). We then specifically held that whatever "higher" expectation of privacy a traveler may have in a private train roomette does not confer upon those occupants the same degree of privacy as a dwelling or hotel or motel room, and observed that it has limited relevance to the question of whether a reasonable person would believe that he or she is unable to terminate an encounter, as distinguished from a search. *Little,* 18 F.3d at 1504–05.

We also rejected, in *Little,* the emphasis placed by the district court upon the agent's failure to specifically advise Little that she had the right to refuse to answer his question, pointing out that there is no *per se* rule requiring such an advisement. *Id.* We observed that the agent did specifically advise Little that she need not acquiesce to the search of her luggage, and this was relevant to the totality of the circumstances surrounding the encounter. *Id.*

In *Little,* we also discussed the significance of either the personal traits or subjective state of mind of the defendant, i.e., "slight physique," "recently undergone a kidney transplant for which he was still taking medication" suggesting that he "was more easily intimidated than some other person," *Id.* at 1505 (quoting *Ward,* 961 F.2d at 1533). We held that they are irrelevant to the objective "reasonable person" test set out in *Bostick* other than to the extent that they may have been known to the officer and influenced his conduct. *Little,* 18 F.3d at 1505 (citing *Bloom,* 975 F.2d at 1455 n. 9; *United States v. Zapata,* 997 F.2d 751, 755 (10th Cir.1993); and *United States v. Laboy,* 979 F.2d 795, 799 (10th Cir.1992)). We rejected, in *Little,*

any rule that would classify groups of travelers according to gender, race, religion, national origin, or other comparable status, while recognizing that they may be relevant in a *particular* case to the extent that they are objectively apparent. *Little,* 18 F.3d at 1505.

Finally, in *Little,* we held that the asking of "incriminating questions" is irrelevant to the totality of the circumstances surrounding the encounter. *Id.* (relying on *Bostick,* 501 U.S. at ——, 111 S.Ct. at 2384).

In *Little,* we remanded to the district court for further proceedings to fully explore the totality of the circumstances surrounding the encounter, employing the *Bostick* test. *Little,* 18 F.3d at 1505–06. The court did not reach the question of whether the agent had reasonable suspicion to detain Little's luggage and subject it to a dog sniff. *Id.* at 1506.

In this case, the court made the following findings/conclusions:

THE COURT: Thank you.... I don't see that *Ward* and *Bloom* are dispositive of this case. Having observed the demeanor of each of the witnesses and listened to your argument, it's my finding that at the time of the initial encounter, the officers had no articulable suspicion that would have justified an encounter.

I further find, however, that they did not seize the defendant or the defendant's luggage constructively or otherwise.

I further find that the officer did not represent that he was required to search the defendant's luggage, and that while the defendant's consent was, in his words, given in order to try to calm down the officer, I don't believe that that adversely impacts the voluntariness of that consent.

I do not believe that the—I find that the officer did not convey by his actions or otherwise that compliance was required, and that a reasonable person would have felt free to decline the request or to terminate the encounter.

There was—and I believe it's amply conceded—that there was no display of force. This individual was healthy. He was experienced. And he was fearful, quite frankly,

328

only because of that experience. Indulging every reasonable presumption against a waiver, I believe that the evidence adduced here today was convincing and that the government's proved that consent was given to search this luggage without duress, without coercion, express or implied.

I believe that, as I said earlier, that the consent was unequivocal. The motion will be denied.

(R., Vol. II at 166–67).

Here, based on the totality of the circumstances, we hold that the district court properly found/concluded that "they did not seize the defendant or the defendant's luggage constructively or otherwise," *id.*, and that Girolamo gave unequivocal, voluntary consent both to the questioning and to the search of his luggage.

**AFFIRMED.**