53 F.3d 332
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
James Anthony ROSS, Kevin T. Tate, Edward P. James, Mansour
W. Saikaly, James Dillehay, and Milton English,
Defendants-Appellants.
 Nos. 93-3772, 93-3880, 93-3901, 93-3915, 93-3916, 93-4040, 93-4198.
 United States Court of Appeals, Sixth Circuit.
 April 27, 1995.
 
 1
 Before: NORRIS and DAUGHTREY, Circuit Judges; and FEIKENS, Senior District Judge.*
 
 
 2
 FEIKENS, Senior District Judge.
 
 I. INTRODUCTION
 
 3
 Defendants, James Anthony Ross, Kevin T. Tate, Edward P. James, Mansour W. Saikaly, James Dillehay and Milton English, challenge their convictions for conspiracy to distribute cocaine and related charges. For the reasons discussed below, the convictions and sentences of the district court are AFFIRMED.
 
 II. GENERAL FACTS[1]
 
 4
 A year-long drug investigation in and around Akron, Ohio culminated in May 1992, when police officers arrested more than fifteen people and executed more than twenty search warrants. A grand jury indictment charged nineteen people, including defendants-appellants, James Ross ("Ross"), Kevin Tate ("Tate"), Edward James ("James"), Mansour Saikaly ("Saikaly"), James Dillehay ("Dillehay"), and Milton English ("English"), with conspiring to distribute cocaine in violation of 21 U.S.C.A. Sec. 846. The indictment also charged that Jerome Gordon ("Gordon") and Anthony Johnson ("Johnson") were involved in the conspiracy. Gordon and Johnson pleaded guilty and were the principal government witnesses at trial.
 
 
 5
 A jury convicted each defendant of conspiring to distribute cocaine and convicted several of the defendants of related gun and substantive drug offenses.[2] The district court sentenced defendants to varying prison terms; defendant Dillehay was sentenced to life imprisonment.
 
 
 6
 Defendants, each of whom submitted a separate brief, raise various challenges to their convictions and sentences. Defendants claim the following errors were committed by the district court: (a) issuance of the search warrant on an insufficient affidavit; (b) failure to suppress evidence seized in violation of the "knock and announce" rule; (c) violation of the Sixth Amendment right to speedy trial; (d) failure to grant severance pursuant to Fed.R.Civ.P. 14; (e) failure to grant various motions made after an attorney conflict of interest was discovered; (f) failure to give the multiple conspiracy jury instruction; (g) insufficiency of evidence on the conspiracy charge; (h) insufficiency of evidence on the firearm charges; (i) admission of co-conspirator hearsay; (j) admission of excerpts of recordings of telephone conversations; (k) admission of certain physical evidence; and (l) various sentencing errors.
 
 III. ANALYSIS
 A. Search Warrant Affidavit Sufficiency
 
 7
 Defendant Dillehay contends that the magistrate judge erred by issuing a warrant authorizing the search of three houses in Akron, 580 Wildwood Drive, 561 Hoye Avenue[3], 1914 Auten Drive, and erred when he denied defendant's motion to suppress certain evidence seized from two of the three houses. His suppression motion was based on his contention that the evidence was seized pursuant to a warrant obtained without probable cause. According to Dillehay, the affidavit on which the magistrate judge based his decision failed to establish probable cause because it contained no factual assertions tending to establish that the three houses contained drug-related evidence.
 
 
 8
 1. Relevant facts.
 
 
 9
 The search and arrest warrants in this case of May 22, 1992, were supported by a 102-page master affidavit of FBI agent Keith Thornton who supervised the Organized Crime Drug Enforcement Task Force ("OCDETF") investigation. The affidavit summarized matters developed during the investigation including information from nine confidential informants and numerous intercepted wiretap conversations. The affidavit described a long-standing, on-going conspiracy to distribute cocaine in which defendant Dillehay played a major role. The affidavit referenced Dillehay and the subject houses in numerous places. Among the information contained in the affidavit was that during November of 1991, a confidential informant had purchased cocaine at the 580 Wildwood address of Dillehay. Also during November of 1991, cocaine was purchased at Dillehay's 1914 Auten address.
 
 
 10
 2. Analysis.
 
 
 11
 This court reviews the district court's decision on a motion to suppress evidence under two standards. First, the district court's findings of fact are upheld unless they are clearly erroneous. Second the district court's legal conclusion as to the existence of probable cause is reviewed de novo with "great deference" accorded to the warrant-issuing magistrate judge's probable cause determination. United States v. Leake, 998 F.2d 1359, 1362 (6th Cir.1993); United States v. Duncan, 918 F.2d 647, 650 (6th Cir.1990).
 
 
 12
 An affidavit supplies probable cause if, in the totality of circumstances, it indicates "a fair probability" that evidence of a crime will be found at the place to be searched. United States v. Bowling, 900 F.2d 926, 930 (6th Cir.1990), cert. denied, 498 U.S. 837 (1990). Direct evidence that a property contains contraband is not needed to establish probable cause to search that property. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir.1986). This court has generally recognized that drug-related evidence is likely to be found where drug dealers live. United States v. Davidson, 936 F.2d 856, 860 (6th Cir.1991) (noting more generally that a magistrate judge may make reasonable inferences based on the type of offense alleged and the nature of the evidence sought).
 
 
 13
 In view of everything he was permitted to consider and infer, the magistrate judge reasonably found that there was a fair probability that drug-related evidence would be found at each of the houses searched. The 102-page affidavit indisputably supplies probable cause to believe that Dillehay was involved in an on-going drug-trafficking business until his arrest. The affidavit also links that business to the houses searched and describes controlled cocaine purchases made in 1991 at 580 Wildwood and at 1914 Auten. Thus, both homes, owned by Dillehay, were used to transact drug business.[4] The affidavit reflected a fair probability that drug-related evidence would be found at 580 Wildwood and 1914 Auten.[5] The district judge, in adopting the magistrate judge's recommendation, did not err in so concluding and did not err in overruling Dillehay's motion to suppress evidence seized from those homes.
 
 B. Knock and Announce Rule
 
 14
 Defendant Saikaly claims that the district court erred by denying his motion to suppress guns and gun-related items that police seized from his home. Saikaly claimed in his suppression motion that the evidence should have been excluded because the forced entry of his home violated the "knock and announce" statute, 18 U.S.C.A. Sec. 3109. Specifically, Saikaly argues that the court erred by finding that the officers, after knocking, heard someone running inside the house, and argues that the officers violated Sec. 3109 by forcibly entering the house before being denied admittance.
 
 
 15
 1. Relevant facts.
 
 
 16
 Around 6:30 a.m. on May 22, 1992, police forcibly entered the home occupied by Saikaly in order to execute an arrest warrant and a search warrant. William Hudnall ("Hudnall"), the Akron police officer leading the entry team, testified that an officer knocked on the door and shouted, "police, search warrant." Hudnall testified that he then heard footsteps inside the house, running away from the door, prompting him to order the other officers to break down the door. According to Hudnall, the forcible entry occurred two to three seconds after officers knocked on the door. Upon entering the house, the officers saw only Saikaly's mother and father. His mother was resting on the sofa and his father was hurrying up the stairs. The officers found Saikaly and the evidence to be seized in his upstairs bedroom.
 
 
 17
 FBI agent Keith Thornton testified that, when preparing to execute the warrants, the police took extra precautions because he had briefed the officers regarding Saikaly's propensity for violence. Specifically, the officers were informed that Saikaly owned several guns, commonly carried a gun in a shoulder holster, and that he had a reputation for violence and had previously been convicted of carrying a concealed weapon and of felonious assault.
 
 
 18
 2. Analysis.
 
 
 19
 The "knock and announce" statute requires officers to announce their authority and purpose and be refused admittance before breaking into a house to execute a search or arrest warrant. 18 U.S.C.A. Sec. 3109 (West 1985). The district court issued written findings of fact concluding that the officers did knock and announce their presence, but that the announcement and the forcible entry were nearly simultaneous. The district court credited Hudnall's testimony that he heard someone retreat quickly from the door and noted that the officers were aware of Saikaly's potential for violence. This court reviews the district court's factual findings for clear error and its legal conclusions de novo. Leake, 998 F.2d at 1362. The district court's factual conclusion that the officers, after knocking, heard someone running from the door is not clearly erroneous.
 
 
 20
 Although the officers were not refused admission before they executed a forcible entry, the forcible entry did not violate the "knock and announce" statute because exigent circumstances justified the violation. United States v. Nabors, 901 F.2d 1351, 1354 (6th Cir.), cert. denied, 498 U.S. 871 (1990). In Nabors the police suspected Nabors of selling drugs, suspected that he would have guns with him, and knew that he commonly wore a bullet-proof vest. Id. The police knocked, announced their presence, and moments later forcibly entered Nabors' door. Id. at 1353. The court held, "[g]iven the threat to their own safety, the safety of those in the apartment, and the need to preserve narcotics evidence, there was compliance with the requirements of ... Sec. 3109." Id. at 1354. Here, the police had an objectively reasonable basis to expect that Saikaly would be armed and that they would be searching for easily destroyed drug-related evidence. In view of these factors, the police were justified in forcibly entering--rather than waiting for a response--when they heard the sounds of retreat in response to the announcement of their presence.
 
 C. Speedy Trial
 
 21
 Defendant Saikaly argues that the ten-month delay in bringing him to trial violated his Sixth Amendment right to a speedy trial.
 
 
 22
 1. Relevant facts.
 
 
 23
 Police arrested Saikaly on May 22, 1992. A grand jury indicted him on June 22, 1992; the district court set the trial for November 17, 1992. Saikaly and his codefendants moved for a continuance of the November trial date. The court then scheduled trial for January 19, 1993. The court, over Saikaly's objection, subsequently rescheduled the trial for March 16, 1993, and the trial began on that date.
 
 
 24
 2. Analysis.
 
 
 25
 The Supreme Court, in Barker v. Wingo, 407 U.S. 514, 530, 33 L.Ed.2d 101 (1972), set out the factors to be considered in assessing whether a delay in bringing a person to trial rises to the level of a Sixth Amendment violation.[6] The factors, none of which is conclusive, are: (1) the length of the delay; (2) the reason for the delay; (3) whether and how the defendant asserted the speedy trial right; and (4) the prejudice suffered by the defendant. Id.; United States v. White, 985 F.2d 271, 275 (6th Cir.1993). Unless a "presumptively prejudicial" delay is shown, this court need not inquire into the other factors. Barker, 407 U.S. at 530. The complexity and nature of the crime are the primary indicators of whether a given delay is presumptively prejudicial. Id.
 
 
 26
 Applying the Barker factors to the facts of this case, Saikaly's claim fails. Given the complexity of this case, a ten-month delay is not presumptively prejudicial. This case involved nineteen defendants, many witnesses, and much evidence. The delay was not intended to secure a tactical advantage and does not weigh heavily in favor or against the government. White, 985 F.2d at 275. Although on three occasions, Saikaly did move to dismiss the indictment for violation of his speedy trial right, his November 1992, continuance motion was one of the initial causes of delay. Finally, there is no proof that the delay hindered, in any way, Saikaly's ability to prepare his case or substantially prejudiced his case in any way. White, 985 F.2d at 276. Defendant Saikaly's Sixth Amendment speedy trial right was not violated.
 
 D. Severance
 
 27
 Defendant English contends that the district court erred by denying his motion, filed pursuant to Federal Rule of Criminal Procedure 14, to sever his trial from that of his codefendants. He contends that the potential for spillover was aggravated by the fact that much of the evidence, especially guns and cocaine, was inflammatory and was prominently displayed throughout the trial. According to English, a jury could not have avoided being influenced by the spillover effect of the evidence against his codefendants, and therefore could not have fairly assessed his guilt or innocence. He also argues that the district court did not take the precautions necessary to ensure that the jury would judge each defendant on an individual basis.
 
 
 28
 1. Relevant facts.
 
 
 29
 English was named in one count, the conspiracy count, of the ten-count superseding indictment. The other nine counts alleged various substantive offenses not involving English. At trial, the government presented thirty witnesses, recordings of more than 200 intercepted telephone conversations, several of which involved English, and approximately 300 exhibits including drugs and guns.
 
 
 30
 2. Analysis.
 
 
 31
 Federal Rule of Criminal Procedure 14 permits district courts to grant a severance of defendants "if it appears that a defendant ... is prejudiced by a joinder ... of defendants ... for trial." This court reviews the denial of such a motion for abuse of discretion. United States v. Lloyd, 10 F.3d 1197, 1215 (6th Cir.1993), cert. denied, 128 L.Ed.2d 213 (1994).
 
 
 32
 The Supreme Court recently reaffirmed the federal system's preference for joint trials and stated, "a district court should grant a severance ... only if there is a serious risk that a joint trial would ... prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, --- U.S. ----, 113 S.Ct. 933, 122 L.Ed.2d 317, 325 (1993). This court has opined that no such risk exists in cases like the one at bar and recently rejected a claim similar to English's, stating that a district court is not compelled to grant a severance merely because "some evidence is admissible against some defendants and not others" or because "the proof is greater against a co-defendant." United States v. Warner, 971 F.2d 1189, 1196 (6th Cir.1992). Further, the fact that inflammatory evidence against one codefendant does not relate to another codefendant does not, in itself, establish prejudice that would support a severance motion. United States v. Gallo, 763 F.2d 1504, 1525 (6th Cir.1985).
 
 
 33
 In order to establish that the district court abused its discretion, English must establish "factually specific and compelling prejudice resulting from joint trial." Benton v. United States, 852 F.2d 1456, 1469 (6th Cir.1988), cert. denied, 488 U.S. 993 (1988). The results, in these types of cases, rest on the court's presumption that a jury is "capable of sorting out evidence and considering each count and each defendant separately." United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987). The government presented substantial evidence linking English to the conspiracy. Further, the evidence was highly compartmentalized and the prosecution carefully avoided implying that the small amount of evidence relating to the non-conspiracy charges was related to English. English has not rebutted the presumption that the jury could accurately judge the guilt of individual codefendants notwithstanding the presentation of inflammatory evidence against other codefendants. English has thus failed to show that the denial of his severance motion substantially prejudiced him. The district court repeatedly and explicitly instructed the jury to separately consider each defendant and each charge. The district court did not abuse its discretion when it denied English's severance motion and did not abuse its discretion when it concluded that a joint trial would not impair the jury's ability to reliably judge English's guilt or innocence.
 
 E. Attorney Conflict of Interest
 
 34
 Defendant James' trial lawyer, Sanford Atkin ("Atkin"), labored under a potential conflict of interest that gives rise to several claims. Specifically, defendants claim that: (a) defendant James received ineffective assistance of counsel; (b) the trial court inquiry into the potential conflict was inadequate; (c) the trial court erred in denying defendant Tate's mistrial motion; and (d) the prosecution failed to make the required "Giglio" disclosure and therefore deprived defendant Dillehay of his due process rights.
 
 
 35
 1. Relevant Facts.
 
 
 36
 Atkin had represented Michael Jones in a previous drug prosecution and, at the time of James' trial, was representing Jones in a civil action that Jones had brought to recover property that the FBI had seized during a drug-trafficking investigation. Jones' civil suit was pending on Judge Bell's docket, the district judge in this case, when the instant case came to trial. Jones, a codefendant of James who pleaded guilty prior to trial, testified for the government in the instant case. On the sixth day of trial, while defendant Tate's lawyer was cross-examining Jones, the district court learned of the Atkin-Jones relationship. The district court apprised defendant James of the situation and allowed James and Atkin to confer. James then told the court, "I really don't think that it would hurt me in any nature ... I really don't believe that it would have anything to do with my case at all." The district court described the potential for conflict and asked James if he still wanted Atkin as his lawyer. James responded, "yes." The next day, following damaging testimony from Gordon, supra, James told the court that he wanted to fire Atkin as his lawyer. The district court rejected his request.
 
 
 37
 2. Analysis.
 
 
 38
 a. Ineffective assistance of counsel.
 
 
 39
 Defendant James argues that his conviction is infirm because he was denied the effective assistance of counsel guaranteed by the Sixth Amendment.[7] James argues that Atkin could not have adequately represented his interests while simultaneously representing Jones. In his only specific allegation, James asserts that, while Atkin's cross-examination of Jones was apparently vigorous, the examination was in fact a "sham." He notes that he learned of the dual representation only after the trial had begun.
 
 
 40
 The Sixth Amendment guarantees the right to a lawyer who is unfettered by conflicts of interest. Wood v. Georgia, 450 U.S. 261, 271, 67 L.Ed.2d 220 (1981). To succeed on this claim, James must show that "there [was] an actual conflict of interest" and that "that conflict has caused ineffective performance in violation of the provisions of the Sixth Amendment." Thomas v. Foltz, 818 F.2d 476, 480 (6th Cir.1987), cert. denied, 494 U.S. 870 (1987) (citing Cuyler v. Sullivan, 446 U.S. 335, 348, 64 L.Ed.2d 333 (1980)). If he can make such a showing, prejudice is presumed. Strickland v. Washington, 466 U.S. 668, 692, 80 L.Ed.2d 675 (1984); Foltz, 818 F.2d at 480.[8] An actual conflict exists only when a defendant points to "specific instances in the record [that] suggest an actual conflict or impairment of [his] interests." Foltz, 818 F.2d at 481 (emphasis added). "There is no violation where the conflict is irrelevant or merely hypothetical." Id.
 
 
 41
 Although Atkin used questionable judgment by undertaking the dual representation and should have advised James of the potential conflict prior to his trial, James has not shown that Atkin labored under an actual conflict of interest. There is no indication that Atkin's representation of Jones prevented Atkin from zealously advocating James' interests. James does not point to any "actual" flaw in the cross-examination of Jones that would indicate that the examination was a sham. Thus, James has not shown how he was deprived of the effective assistance of counsel.
 
 
 42
 b. Trial Court Inquiry into Potential Conflict.
 
 
 43
 Defendant James also contends that the district court erred by failing to properly inquire into the potential conflict created by Atkin's dual representation.
 
 
 44
 When a trial court learns that an attorney might be representing conflicting interests, the court must investigate further, advise the defendant of the potential conflict, and receive a waiver if that is the expressed wish of the defendant. United States v. Tatum, 943 F.2d 370, 379 (4th Cir.1991). See also United States v. Straughter, 950 F.2d 1223, 1233 (6th Cir.1991), cert. denied, 117 L.Ed.2d 471 (1992).
 
 
 45
 The district court satisfied its obligation to inquire into the potential conflict presented in this case. The district court personally addressed James and told him of the problems created by dual representation. After the court advised him regarding the potential conflict of interest, James explicitly waived any objection to being represented by Atkin. Only after his case began to look bad did he object to being represented by Atkin. Thus, the district court properly inquired into the potential conflict.
 
 
 46
 c. Tate's Mistrial Motion.
 
 
 47
 Defendant Tate argues that the district court erred when it denied his motion for mistrial after Atkin's relationship with Jones came to light. Tate argues that Atkin's relationship with Jones, coupled with the fact that his lawyer did not learn of that relationship until mid-trial, impaired his lawyer's ability to represent him. Specifically, Tate argues that, had his lawyer been aware of Atkin's relationship with a government witness, he would have been much less likely to share information and strategy with him.
 
 
 48
 This court reviews the denial of a mistrial motion for abuse of discretion and will find an abuse only if an error "rendered [the trial] unfair." United States v. Atisha, 804 F.2d 920, 926-27 (6th Cir.1986), cert. denied, 479 U.S. 1067 (1987). A mistrial is appropriate only when a seriously prejudicial error occurs. United States v. Moore, 917 F.2d 215, 220 (6th Cir.1990), cert. denied, 499 U.S. 963 (1991).
 
 
 49
 Tate has failed to make any concrete allegation regarding how Atkin's relationship with Jones prejudiced the fairness of his trial. At most, Tate posits a hypothetical injury that could have resulted from Atkin's conduct. He makes no specific showing as to how Atkin's relationship with Jones actually impaired his defense. No seriously prejudicial error occurred, and the district court did not abuse its discretion by denying Tate's mistrial motion.
 
 
 50
 d. Giglio Disclosure.
 
 
 51
 Defendant Dillehay contends that the prosecution's failure to disclose Atkin's relationship with Jones deprived him of due process. He contends that, had the prosecution disclosed the Atkin-Jones relationship, he could have used the matter to more effectively cross-examine Jones.
 
 
 52
 The prosecution offends a defendant's right to due process if it fails to disclose impeachment evidence regarding a witness whose "reliability ... may well be determinative of guilt or innocence" (the "Giglio " disclosure). Giglio v. United States, 405 U.S. 150, 153-54, 31 L.Ed.2d 104, 108 (1972).[9] Due process is not offended if the prosecution discloses impeachment information in time for use at trial. United States v. Presser, 844 F.2d 1275, 1283 (6th Cir.1988).
 
 
 53
 The Atkin-Jones relationship came to light at trial and all of the defense lawyers, including defendant Dillehay's lawyer, were therefore able to cross-examine Jones on the matter. More important, because Jones did not implicate Dillehay, Dillehay's chance for success did not turn on his ability to impeach Jones. No due process deprivation occurred.
 
 F. Multiple Conspiracy Jury Instruction
 
 54
 Defendants argue that the district court erred by not giving the "multiple conspiracy" instruction.[10] They point to United States v. Warner, 690 F.2d 545, 551 (6th Cir.1982), in which this court stated that when the jury within reason could find more than one conspiracy, the trial court should give the jury a multiple conspiracy instruction.[11] Defendants contend that, while the indictment alleged a single conspiracy involving all of the defendants, the evidence at trial instead showed the existence of several small conspiracies.[12]
 
 
 55
 1. Relevant facts.
 
 
 56
 The indictment charged that defendants participated in a single, on-going conspiracy to distribute cocaine. Specifically, the indictment charged that James and Tate (and others who subsequently pleaded guilty) supplied cocaine to Dillehay (and Gordon and Johnson, both of whom pleaded guilty) who then distributed the cocaine to English, Ross, and Saikaly (and others who subsequently pleaded guilty). The indictment charged that Dillehay, Gordon, and Johnson transferred cocaine between themselves when one of their respective sources dried up.
 
 
 57
 At trial, defendants jointly requested a jury instruction that would have directed the jury to acquit them if it found that they did not act as conspirators in one large conspiracy (as charged in the indictment) but rather entered into several smaller conspiracies. The district court rejected the request, instead instructing, "[i]t is the burden of the government to prove ... that the charged conspiracy existed ... and that the defendants ... were members of that conspiracy."
 
 
 58
 2. Analysis.
 
 
 59
 This court reviews challenged jury instructions to determine whether the instructions as a whole fairly submit the law and fact issues to the jury, United States v. Newcomb, 6 F.3d 1129, 1132 (6th Cir.1993), and reviews a district court's refusal to give a particular requested instruction for abuse of discretion. United States v. Frost, 914 F.2d 756, 764-66 (6th Cir.1990). A district court's refusal to give a particular requested instruction presents a basis for reversal only if the instructions as a whole fail to convey the substance of the requested instruction. Newcomb, 6 F.3d at 1132.
 
 
 60
 While a conspiracy might be divided into distinct sub-groups, it remains a single conspiracy "[a]s long as the different sub-groups are committing acts in furtherance of one overall plan." Warner, 690 F.2d at 550 n. 8. The fact that each member of a conspiracy did not know of, or become involved in, all the acts of the conspiracy does not transform it into multiple conspiracies. United States v. Moss, 9 F.3d 543, 551 (6th Cir.1993).
 
 
 61
 The district court instructed the jury that the government had to prove that "the charged conspiracy existed ... and that the defendants ... were members of that conspiracy." The district court did not commit reversible error by refusing to give the multiple conspiracy instruction. Even assuming that defendants are correct in asserting that the jury could have reasonably found more than one conspiracy, the district court's refusal to give the precise instruction requested by defendants was harmless since the instructions, as a whole, informed the jury that defendants could not be found guilty unless the government proved the existence of the single conspiracy alleged in the indictment.[13] Thus the instructions, as a whole, fairly framed the issues.
 
 
 62
 G. Sufficiency of the Evidence on the Conspiracy Charge
 
 
 63
 Defendants Dillehay, Ross, English, Tate, and Saikaly, argue that the government presented insufficient evidence to support their conspiracy convictions.
 
 
 64
 1. Relevant facts.
 
 
 65
 Testimony from Gordon and Johnson (two defendants who pleaded guilty) implicates each defendant in buying and selling or otherwise distributing cocaine. Further, each defendant participated in intercepted phone conversations that, as interpreted by Gordon and Johnson, concerned the cocaine trade.
 
 
 66
 2. Analysis.
 
 
 67
 This court reviews an insufficiency of evidence claim to determine whether, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986), aff'd, 483 U.S. 171 (1987). This court views all the evidence in context, indulges all reasonable inferences, and resolves credibility issues in favor of the jury's verdict. United States v. White, 788 F.2d 390, 393 (6th Cir.1986). This court does not consider the credibility of witnesses when assessing the sufficiency of the evidence. United States v. Hilliard, 11 F.3d 618, 620 (6th Cir.1993), cert. denied, 127 L.Ed.2d 412 (1994).
 
 
 68
 To convict a person of conspiracy under 21 U.S.C.A. Sec. 846, the government must prove "the existence of an agreement to violate the drug laws and that each co-conspirator knew of, intended to join, and participated in the conspiracy." United States v. Lee, 991 F.2d 343, 348 (6th Cir.1993).
 
 
 69
 Defendants' claims relate to the quality, rather than to the legal sufficiency, of the evidence. They essentially challenge the credibility of the prosecution's witnesses. Defendants generally contend that, without any "hard" evidence, the testimony of admitted drug dealers is not sufficient to support their conspiracy convictions. This court resolves all credibility issues in favor of the jury's verdict. The evidence presented by the prosecution was therefore sufficient to permit a reasonable juror to find each element of the conspiracy charge.
 
 
 70
 H. Sufficiency of the Evidence on Firearm Charge
 
 
 71
 Defendants Ross and Saikaly argue that the prosecution presented insufficient evidence to support their convictions on the charge that they violated 18 U.S.C.A. Sec. 924(c)(1) which imposes a five-year prison term on anyone who "during and in relation to any ... drug-trafficking crime ... uses or carries a firearm." 18 U.S.C.A. Sec. 924(c)(1) (West Supp.1994).
 
 
 72
 1. Relevant facts.
 
 
 73
 The prosecution presented evidence that defendant Ross purchased a handgun the day after Gordon, in an intercepted telephone conversation, warned Ross (to whom Gordon supplied drugs) to be careful in light of recent robberies. On the day he purchased the gun, Ross called Gordon to confer with him about purchasing a gun.
 
 
 74
 Regarding defendant Saikaly, the prosecution presented evidence that police arrested him on April 30, 1992, and that, at that time, he was carrying a handgun, ammunition, and $22,000 in cash. Further, on May 22, 1992, police searched his bedroom and found ammunition, a loaded shotgun, $1,100, and a pager.
 
 
 75
 2. Analysis.
 
 
 76
 This court has interpreted Sec. 924(c)(1) broadly. In particular, the term "uses" "cover[s] the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions." United States v. Acosta-Cazares, 878 F.2d 945, 952 (6th Cir.1989), cert. denied, 493 U.S. 899 (1989) (emphasis added). Possessing a weapon merely for its emboldening effect or to otherwise facilitate a drug transaction constitutes a violation of Sec. 924(c)(1). United States v. Warner, 10 F.3d 1236, 1239 (6th Cir.1993). This court approaches this contention by asking whether any rational trier of fact could have found the essential elements of the crime.
 
 
 77
 Ross was a major, long-time participant in the drug-trafficking conspiracy and had a strong association with Gordon. He purchased the handgun after being warned of drug robberies by Gordon. Thus, a jury could reasonably conclude Ross purchased the firearm for protection and use in his drug-trafficking activities. The evidence was sufficient to support Ross' Sec. 924(c)(1) conviction.
 
 
 78
 In view of the evidence indicating that Saikaly was routinely buying and distributing cocaine, the evidence is sufficient to support his Sec. 924(c) conviction. A jury could have reasonably concluded both that he used a gun and that the gun was used in relation to, i.e., to facilitate, a drug-trafficking crime. A reasonable juror could have found that Saikaly carried guns to protect himself, the large amounts of cocaine he routinely purchased, and the large sums of drug-related cash he carried.
 
 I. Co-conspirator Hearsay Exception
 
 79
 Defendant Tate contends that the district court erred by admitting hearsay testimony. Tate argues that co-conspirators' statements should not have been admitted against him because the prosecution did not establish by a preponderance of the evidence that he was a member of the conspiracy involving Gordon and Johnson. He argues that, while the evidence may have proven that a conspiracy existed between Johnson and Gordon, there was no evidence to support the finding that Tate was a part of that conspiracy. He does not indicate any particular co-conspirator statements to which this contention is directed.
 
 
 80
 1. Relevant facts.
 
 
 81
 Tate's introduction into the conspiracy occurred late in 1991 when he oversaw Jones' cocaine distributions to Johnson while Jones vacationed in Hawaii. Following the FBI raid of Jones' residence in February, 1992, Jones went to Tate's home and used the phone to warn Johnson. Jones instructed Johnson to contact Tate for all future cocaine transactions. Over an approximate one-month period, there were numerous telephone and repeated personal contacts between Tate and Johnson which resulted in cocaine distributions totalling roughly twelve (12) kilograms.
 
 
 82
 2. Analysis.
 
 
 83
 This court reviews a district court's determination that a statement comes within an exception to the definition of hearsay for abuse of discretion. United States v. Curro, 847 F.2d 325, 328 (6th Cir.1988), cert. denied, 488 U.S. 843 (1988). Under Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exception, a statement is not hearsay if the prosecution establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant against whom the statement is offered was a member of the conspiracy; and (3) the statement was made in the course and in furtherance of the conspiracy (the "Enright" requirements). United States v. Enright, 579 F.2d 980, 986 (6th Cir.1978).
 
 
 84
 A preponderance of the evidence clearly shows that Tate participated in a cocaine distribution conspiracy. This is true even under Tate's characterization of the facts since a person may be involved in only a small part of a conspiracy's operations and still be considered a member of that conspiracy. The district court ruled that sufficient evidence had been introduced by the prosecution to establish by a preponderance of the evidence that a conspiracy existed and that the prosecution had, thus, satisfied the Enright requirements. The district court did not abuse its discretion by admitting the statements of Tate's co-conspirators.
 
 
 85
 J. Admission of Excerpts of Recordings of Telephone Conversations
 
 
 86
 Defendant Tate argues that the district court erred by admitting edited versions of the intercepted telephone conversations rather than the original full recordings. He argues that the original tapes were necessary to allow the jury to accurately assess whether the participants in the conversations were actually speaking in code. He contends that, had the jury heard the entirety of the conversations, it would have been better able to decide whether the recorded people were indeed speaking in code.
 
 
 87
 1. Relevant facts.
 
 
 88
 At trial, the prosecution presented recordings of phone conversations intercepted by wiretapping. Rather than presenting the entirety of each recorded conversation, the prosecution presented only excerpts from some of the recordings. The government sought to prove that the participants in the conversations were speaking in code in order to mask their wrongdoing. To make that showing, the government had Johnson explain to the jury the true meaning of the facially innocent conversations.
 
 
 89
 2. Analysis.
 
 
 90
 When a party fails to make a timely objection, stating the specific grounds for the objection, this court's review is limited to plain error. United States v. Levy, 904 F.2d 1026, 1030 (6th Cir.1990), cert. denied, 498 U.S. 1091 (1991). At trial, Tate objected only generally to admitting the recordings. This court will therefore review for plain error only. This conclusion is buttressed by the fact that Tate did not move to require the prosecution to present the deleted parts of the conversations; nor did he seek to introduce those parts during his case.
 
 
 91
 Because Tate does not allege that the deleted parts of the conversations directly rebut the parts introduced at trial, it cannot be said that the trial court committed plain error by admitting the "composite" tapes rather than sua sponte requiring the prosecution to present the original, unedited tapes.
 
 K. Admissibility of Physical Evidence
 
 92
 Defendants Ross, Dillehay, and Saikaly challenge various district court evidentiary rulings. This court reviews evidentiary rulings for abuse of discretion, maximizing the probative value and minimizing the prejudicial effect of the evidence. United States v. Zipkin, 729 F.2d 384, 389 (6th Cir.1984).
 
 
 93
 1. Defendant Ross' argument.
 
 
 94
 Defendant Ross contends that the district court erred by admitting, as evidence against him, three (3) kilograms of cocaine and packaging materials seized from Johnson's house. Since, according to Ross, nothing linked that evidence to him, its tendency to cause unfair prejudice outweighed its probative value, and the evidence should therefore have been excluded under Federal Rule of Evidence 403.
 
 
 95
 a. Relevant facts.
 
 
 96
 The evidence at trial revealed that on March 6, 1992, Johnson obtained three (3) kilograms of cocaine from Tate, two of which were ordered by defendant Saikaly with the other one for Gordon. Johnson's testimony was corroborated by a series of intercepted telephone calls beginning March 4, 1992 and continuing until a call from Saikaly seconds before Johnson's arrest. Intercepted telephone calls on Gordon's line on March 6, 1992, revealed that Gordon contacted his long-time cocaine dealers, including Ross, in anticipation of receiving his share of the cocaine.
 
 
 97
 b. Analysis.
 
 
 98
 Contrary to Ross' assertion, the cocaine was linked to him. Trial evidence strongly indicates that some of the three (3) kilograms were en route to Ross. Thus, the evidence was highly probative, since it showed his involvement in the conspiracy, showed his relationship to the cocaine, and did not have a tendency to cause unfair prejudice. The district court did not abuse its discretion by admitting the cocaine and packaging materials.
 
 
 99
 2. Defendant Dillehay's argument.
 
 
 100
 Defendant Dillehay contends that the district court improperly admitted a loaded gun as evidence against him. He claims that no evidence linked the gun to him and points out that the district court dismissed the charge that he was a felon in possession of a firearm.[14]
 
 
 101
 a. Relevant facts.
 
 
 102
 Gordon testified that Dillehay lived at 580 Wildwood with his sons. The subject firearm was seized from defendant's bedroom at 580 Wildwood. Johnson testified that he met defendant Dillehay at both the Wildwood and Auten addresses throughout the period of the conspiracy and broke down kilogram quantities of cocaine into smaller quantities at those locations.
 
 
 103
 b. Analysis.
 
 
 104
 The district court's dismissal of the felon in possession of a firearm count against Dillehay is irrelevant to the admissibility of the gun because guns are probative in drug prosecutions since they are tools of the drug trade. See United States v. Gahagan, 865 F.2d 1490, 1499 (6th Cir.1989); United States v. Marino, 658 F.2d 1120, 1123 (6th Cir.1981). The evidence revealed that Dillehay was involved in a conspiracy to distribute cocaine, he lived in the house in which police seized the gun, slept in the bedroom in which they found it, and had previously handled drugs at that address. The district court did not abuse its discretion by admitting the gun into evidence.
 
 
 105
 3. Defendant Saikaly's argument.
 
 
 106
 Defendant Saikaly argues that the district court erred by admitting a gun and $22,000 cash that New York police seized from him when he was arrested on charges unrelated to the present case.[15] He contends that the evidence was not relevant under Federal Rule of Evidence 401. Saikaly contends that, since this evidence did not lead to a finding of wrongdoing in New York, it should not have been admitted against him in his federal trial.
 
 
 107
 a. Relevant facts.
 
 
 108
 Defendant Saikaly was charged with conspiracy to distribute cocaine and with three substantive gun offenses, two of which involved the subject gun. Trial testimony revealed, in part, that on April 30, 1992, while responding to a robbery call, New York City police stopped a car occupied by defendant Saikaly and seized the subject gun. Among the items seized from Saikaly's bedroom on May 22, 1992, were a plastic gun case, corresponding to the subject gun. In an intercepted telephone call on March 2, 1992, Johnson stated that Saikaly had been to his house earlier that day with the subject gun. Johnson testified that Saikaly gave him $48,000 cash in late February 1992 for two (2) kilograms of cocaine and that Saikaly had ordered another two (2) kilograms which he obtained from Tate on March 6, 1992.
 
 
 109
 b. Analysis.
 
 
 110
 The evidence against Saikaly was properly admitted. Since the evidence had some tendency to establish facts necessary to the prosecution's case, the evidence satisfied the liberal Rule 401 test.
 
 L. Sentencing Issues
 
 111
 1. Dillehay's Life Sentence.
 
 
 112
 Dillehay asserts that the district court erred by determining that he could be held accountable for 15-50 kilograms of cocaine for purposes of establishing a base offense level and argues that the district court erred by finding him to be a "career offender" under the Sentencing Guidelines.
 
 
 113
 The district court sentenced Dillehay under 21 U.S.C.A. Sec. 841(b)(1)(A) which imposes a mandatory life sentence on a defendant with two or more prior drug convictions who is convicted of a narcotics offense involving five (5) kilograms or more of cocaine. 21 U.S.C.A. Sec. 841(b)(1)(A) (West Supp.1994) Dillehay has two prior drug convictions and, according to trial testimony, personally handled more than twelve (12) kilograms of cocaine during the course of the conspiracy. The district court was compelled to impose the life sentence. The applicability of the statutory mandatory sentence renders Dillehay's contentions irrelevant.
 
 
 114
 2. Mitigating Role Sentence Reduction.
 
 
 115
 English argues that the district court erred by refusing to grant him a "mitigating role" reduction under the Sentencing Guidelines. He contends that he was entitled to a reduction since his conduct, acting as a drug courier on a few occasions, was less culpable than that of his co-conspirators.
 
 
 116
 In setting English's base offense level, the district court, instead of considering the amount of cocaine that English could have foreseen being involved in the conspiracy, considered only the amount of drugs that, according to trial testimony, English personally handled. The district court, in effect, took English's minor role into account when calculating his base offense level.
 
 
 117
 While a mitigating role reduction would have certainly been appropriate, had English's base offense level been calculated by considering the total amount of cocaine involved in the conspiracy, the district court accounted for the fact that he played a minor role in the overall conspiracy by considering only the amount of cocaine that he personally handled in setting his base offense level. The district court properly declined to grant English a mitigating role reduction.
 
 IV. CONCLUSION
 
 118
 For the reasons discussed above, defendants' convictions and sentences for conspiring to distribute cocaine and related charges are AFFIRMED.
 
 
 
 *
 Hon. John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Because the relevant facts in this case vary with each defendant and his basis of appeal, the specific facts related to each defendant and his claim of appeal is discussed separately in the analysis section of this opinion
 
 
 [2]
 Defendants Ross and Tate were also convicted of gun-related charges. Defendant Saikaly was convicted of three other substantive gun offenses
 
 
 [3]
 The prosecution presented no evidence seized from Hoye Avenue. Thus, Dillehay's argument regarding that address is moot
 
 
 [4]
 The fact that the allegations relating specifically to the houses are slightly dated is not problematic when, as here, the affidavit portrays an on-going, long-standing operation. United States v. Reyes, 798 F.2d 380, 382 (10th Cir.1986)
 
 
 [5]
 The district court's denial of Dillehay's suppression motion is also justified by the Leon exception which makes the exclusionary rule inapplicable to evidence obtained "in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922, 82 L.Ed.2d 677 (1984). The officers performing the search apparently reasonably relied on the warrants issued on the strength of the long and detailed affidavit prepared by a 22-year FBI veteran
 
 
 [6]
 While acknowledging that Barker controls this case, Saikaly points out that he was not brought to trial within the time limit established by Ohio's speedy trial statute. He argues that this fact is an indication that his constitutional speedy trial right was violated. This argument is unpersuasive since state statutes may set a stricter deadline than the Constitution requires. Barker expressly eschewed the rigid limits preferred by the states in favor of a more flexible approach. Barker, 407 U.S. at 523 (noting, "the States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise")
 
 
 [7]
 This court generally leaves the issue of the effectiveness of counsel for collateral review. United States v. Moss, 9 F.3d 543, 552 (6th Cir.1993). This court will, however, entertain an ineffective assistance claim on direct appeal when the record permits an informed assessment of the claim. United States v. Wunder, 919 F.2d 34, 37 (6th Cir.1990). The record is sufficient to allow this court to assess James' claim
 
 
 [8]
 This approach is an adaptation of the general rule that, in order to establish that one received ineffective assistance, one must show that his lawyer's performance was deficient and that the deficiency prejudiced him. Strickland v. Washington, 466 U.S. at 687
 
 
 [9]
 This rule is an application of the general rule that the prosecution must disclose to a defendant evidence favorable to the defendant that, if suppressed, would deprive the defendant of a fair trial. Brady v. Maryland, 373 U.S. 83, 87, 10 L.Ed.2d 215 (1963)
 
 
 [10]
 Defendants also make the related argument that the proof at trial prejudicially varied from the facts alleged in the indictment. "If an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby." United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982) (emphasis added). Defendants' argument is meritless because, while the evidence could have permitted the jury to reasonably conclude that multiple conspiracies existed, the evidence also permitted the jury to reasonably conclude that the single conspiracy alleged in the indictment existed
 
 
 [11]
 Because Warner had not requested such an instruction, this court then considered whether the failure to give the instruction was plain error and concluded that it was not. Warner, 690 F.2d at 551
 
 
 [12]
 Except for James who merely adopts this argument, each defendant makes this argument and attempts to portray his participation in the conspiracy as minimal
 
 
 [13]
 In United States v. Davenport, 808 F.2d 1212, 1218 (6th Cir.1987), the court stated that the district court should have given a multiple conspiracy instruction since a jury could have reasonably concluded that there were multiple conspiracies. The court held, however, that the failure to give the instruction was harmless error since the instructions as a whole required the jury to find the existence of the conspiracy alleged in the indictment
 
 
 [14]
 Dillehay also contends that the prosecution, in its closing argument, improperly referred to guns as tools of the drug-trafficking trade. The prosecution, however, did not refer to the gun during its closing argument
 
 
 [15]
 New York authorities dropped the charges for which they arrested him and later sent the evidence they had seized to federal authorities in Ohio